**ECONOMY FINANCE CORPORATION,**
Transferee of the Assets of National
Public Life Insurance Company,
and
United Public Life Insurance Company,
Plaintiffs-Appellees,

v.

**UNITED STATES of America,**
Defendant-Appellant.

Nos. 72-2024, 72-2025.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1973.

Decided July 16, 1974.

Scott P. Crampton, Asst. Atty. Gen., John A. Townsend, Atty., Tax Div.,

U. S. Dept. of Justice, Washington, D. C., Stanley B. Miller, U. S. Atty., Indianapolis, Ind., for defendant-appellant.

Theodore R. Dann, Indianapolis, Ind., William A. Cromartie, Chicago, Ill., for plaintiffs-appellees.

Before STEVENS and SPRECHER, Circuit Judges, and CAMPBELL,* Senior District Judge.

SPRECHER, Circuit Judge.

These consolidated appeals involve the qualification of National Public Life Insurance Company[1] and United Public Life Insurance Company (taxpayers) for tax treatment under 26 U.S.C. § 801 as life insurance companies.

I

During the taxable year of 1959, National Public Life Insurance Company (National Life), a wholly owned subsidiary of Economy Finance Corporation, was engaged in reinsurance as a Delaware corporation. The stockholders of Economy Finance, an Indiana corporation engaged in consumer lending and finance, were William L. Schloss, his wife, and his children (as primary beneficiaries of various trusts). During the taxable years of 1959 and 1961, United Public Life Insurance Company (United Life) was a Delaware corporation engaged in reinsurance. Its stockholders were Schloss Brothers, a partnership, and the children of William L. Schloss (as primary beneficiaries of various trusts).

For the years in question, taxpayers filed tax returns on the assumption that they qualified as life insurance companies under 26 U.S.C. § 801(a). The commissioner determined that § 801(a) was inapplicable to them and assessed deficiencies plus interest against Economy Finance as transferee and United

Life in the amount of $62,275.93 and $101,627.11 respectively. Taxpayers brought suit for a refund.

The parties settled all issues raised in the pleadings except the question of taxpayers' qualification for taxation as life insurance companies under the reserve-ratio test.

The two insurance companies were engaged in the business of reinsuring credit life and credit health and accident (H & A) insurance policies; they did no other business. The insurance contracts reinsured by National Life in 1959 were issued to insure the lives and health of debtors of Indianapolis Morris Plan Corporation, related in its ownership to National Life, and debtors of other finance companies unrelated to National Life. The insurance contracts reinsured by United Life in 1969 were issued to insure the lives and health of debtors of Economy Finance and its subsidiaries, related in their ownership to United Life, and, in 1961, to insure the debtors of Economy Finance and its subsidiaries, Indianapolis Morris Plan Corporation, and other finance companies unrelated to United Life.

These finance companies typically made three-year consumer credit loans, which were paid off in an average of twenty-one months. At the time such loans were made, the companies suggested that the debtor take out life or life and H & A credit insurance policies so that

(a) in case of death or dismemberment of the debtor, the total outstanding balance of the loan would be repaid upon proof of claim;

(b) in case of sickness or injury of the debtor such that he or she was disabled for a minimum 14-day period, the stream of payments would be met as each fell

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. Economy Finance Corporation appears as a party to this action solely as transferee of National Public Life Insurance Company. National Life was dissolved on December 23, 1960.

due during the period of disability.

The term of the insurance would cover the term of the loan. If the debtor agreed to purchase such insurance, an amount equal to the total cost of carrying insurance for the term of the loan was added to the principal of the loan and then deducted from the amount given to the debtor.

Rather than insuring the credit life and H & A insurance directly, the taxpayers entered into an arrangement with Standard Life Insurance Company (Standard), a corporation independent of the Schloss holdings, which issued each policy purchased. The finance companies forwarded the premium (less agent's commission) along with the insurance application to the Schloss Insurance Agency (SIA), an Indiana general partnership owned by the Schloss family. SIA issued an insurance contract underwritten by Standard and acted as Standard's general agent for issuing and administering the policies. After deducting an agent's commission, SIA forwarded the balance of the premium received to Standard.

Pursuant to the agreement, Standard reinsured each credit life and H & A policy under reinsurance treaties entered into between Standard and National Life and between Standard and United Life.[2]

The *life* reinsurance treaties (identical for each taxpayer) provided for Standard to cede to taxpayer 100 percent of each credit life insurance policy issued by Standard with respect to the debtors of the finance companies. The treaties contained the following provisions:

(1) Standard agreed to pay taxpayer a monthly reinsurance premium on each life insurance policy reinsured equal to 98.3 percent of the gross monthly *paid* premiums for the preceding month, less commissions paid to agents.

(2) "Gross monthly paid premiums" were defined as the *full* premiums on all policies issued, less premiums refunded on any canceled credit life insurance policy.

(3) At the time the reinsurance premium was paid to taxpayer, Standard was to submit a bill to taxpayer for all losses paid by it during the preceding month and for its direct demonstrable expenses, including taxes, claim expense, and printing, paid in the preceding month.

(4) Cancellation of the treaty agreement by taxpayer upon thirty days' notice would not affect any policies written and reinsured prior to the effective date of cancellation of the treaty.

The *health and accident* reinsurance treaties (identical for each taxpayer) provided for Standard to cede to taxpayer 100 percent of each credit H & A policy issued by Standard with respect to the debtors of the finance companies. The treaties contained the following provisions:

(1) Standard agreed to pay taxpayer a reinsurance premium equal to 98.3 percent of the gross monthly *earned* premiums thereon, less commissions paid to agents and less Standard's direct demonstrable expenses.

(2) "Gross monthly earned premiums" were defined as "the pro rata part of the single premium corresponding to the duration of insurance coverage pro-

2. Plaintiffs' expert witness, Arthur Crooks Eddy, an actuary, testified that there are two basic types of reinsurance arrangements. Risk premium reinsurance is an arrangement where only the mortality or morbidity risk is reinsured. The ceding company retains a portion of the premium to cover its liability for expenses and the reinsurer receives the balance for the mortality or morbidity element to cover its liability for claims. Coinsurance is an arrangement whereby a larger company offers to take the place of a smaller issuing company in the first policy year or so of some percentage of the issuing company's business. The reinsurer receives the entire premium and is responsible for the surplus drain in the first year of the policy (commissions plus underwriting expense generally exceed the premium in the first year). Mr. Eddy testified that the reinsurance agreement in this case is a hybrid of the classic categories.

vided for in said policy during the preceding month."

(3) At the time the reinsurance premium was paid to taxpayer, Standard was to submit a bill for all losses paid by it during the preceding month.

(4) Each treaty provided, "It is understood that NATIONAL [or UNITED] is reinsuring said risks for a period of one month only; provided, however, that this agreement shall automatically renew itself from month to month until such time as the individual policies covered by this treaty run out, lapse, are canceled or in any way terminate; or until this treaty is canceled as provided in ARTICLE IX, NATIONAL [or UNITED] shall have no right, title or interest in any unearned premiums or unearned premium reserves held by STANDARD."

Cancellation of the Treaty Agreement by taxpayer upon 30 days' notice limited their liability as follows:

STANDARD shall pay to NATIONAL [or UNITED] within 30 days after date of such cancellation the total of all earned portions of single premiums as of the date of such cancellations, for such policies less an unpaid claim reserve. Such unpaid claim reserve shall be an amount estimated by STANDARD to be sufficient to pay all claims and expenses reimbursable hereunder for losses incurred or unreported and unpaid at the date of such cancellation. On the date six months after such cancellation an accounting shall be made of such claims paid and STANDARD shall thereupon pay to NATIONAL [or UNITED] any excess of the aforesaid claim reserve over such claims actually paid, together with expenses reimbursable hereunder, conversely, NATIONAL [or UNITED] shall pay to STANDARD any excess paid by it for such claims and expenses incident thereto over and above the aforesaid claim whereupon all liability of the parties each to the other shall cease and determine.

Article IX further provided that:

If NATIONAL [or UNITED] cancels this treaty as provided for [herein], and should the claims and expenses subsequently incurred and paid in connection with all business covered under this treaty then in force carried by STANDARD, plus one and seven-tenths per cent ($1\frac{7}{10}\%$) of unearned gross premiums on such date of cancellation, exceed the unearned net premiums held by STANDARD on the date of cancellation, then NATIONAL [or UNITED] will, thirty (30) days after the expiry of all such insurance contribute to STANDARD a sum that would be necessary to reimburse STANDARD for the following items only to the extent that the total of such items exceed the unearned net premiums held by STANDARD on the date of said cancellation, but in no case more than 10% of the total premiums earned by NATIONAL [or UNITED] during the twelve (12) months immediately preceding the date of cancellation of this Contract:

1. One and seven-tenths percent ($1\frac{7}{10}\%$) of such gross unearned premiums.

2. STANDARD's direct demonstrable expenses incurred after such effective date of cancellation.

3. Losses paid and incurred on all insurance written under this treaty not recovered through reinsurance with NATIONAL [or UNITED].

The additional amount to be so retained by STANDARD, if any, shall be refunded to STANDARD by NATIONAL [or UNITED] on demand, any time before one (1) year after the expiration of the last of said policies.

STANDARD shall have the right to retain all premiums unearned at the date of cancellation.

II

With respect to the agreement to reinsure the H & A policies on an "earned"

basis, at trial the parties stipulated as follows:

National Life and United Life reinsured credit accident and health insurance on a month-to-month basis, rather than for the full term of the policies, in order to avoid holding any unearned accident and health premium reserves and, therefore, reduce the amount of reserves which might be considered as nonqualifying reserves for the purpose of determining whether they were entitled to be taxed as life insurance companies under the reserve-ratio formula in § 801(a) of the Code.

Standard reported the H & A reinsurance premiums not yet due as an unearned premium reserve on its annual statement to the California Insurance Department. Out of the unearned premium reserve set up by Standard, a balance roughly equivalent to one month's life plus H & A claims was kept in a bank checking account. The balance of the reserve fund was invested from time to time in Economy Finance Corporation debentures.[3] The interest from these debentures was remitted to SIA as an additional commission. "Taxpayers" did not report any portion of the reinsurance premiums not yet due on their annual statements to the Delaware insurance authorities.

For the taxable years in question, taxpayers reported under 26 U.S.C. § 801(b)(5) the following mean reserves on their tax returns, which resulted in the following percentage qualifying ratio under 26 U.S.C. § 801(a):

| Taxpayer | Taxable Year | Life Insurance Reserves (Numerator) | Total Reserves (Denominator) | Percentage Qualifying Ratio |
|---|---|---|---|---|
| National Life | 1959 | $184,928.50 | $204,334.37 | 90.50% |
| United Life | 1959 | 23,497.00 | 26,561.79 | 88.46% |
| United Life | 1961 | 322,055.00 | 336,215.63 | 95.79% |

The Internal Revenue Service determined upon audit that, for purposes of the reserve-ratio qualifying formula of § 801(a), taxpayers must include the nonqualifying H & A unearned premium reserve held by Standard in their total insurance reserves. This decision was based on the premise that the reserve-ratio test was intended to reflect the primary insurance risks assumed by taxpayers, and to grant life insurance taxation treatment only to taxpayers primarily insuring life insurance risks. Excluding reserves maintained with respect to the H & A policies from taxpayers' total insurance reserves distorted the composition of the risks actually assumed. Accordingly, the I.R.S. adjusted taxpayers' total reserves by an amount equal to the arithmetic mean as of the beginning and end of each year, of the gross monthly unearned credit H & A

3. Plaintiffs' Exhibit 14 indicates the following disposition of the reserves as of December 31 of each year listed.

| | Unearned accident and health premiums reserve | Amount of those reserves on loan to Economy Finance | Remaining amount in bank account |
|---|---|---|---|
| 1958 | $369,424.84 | $313,000.00 | $56,424.84 |
| 1959 | 356,080.05 | 293,000.00 | 63,701.52 |
| 1960 | 379,549.99 | 313,000.00 | 67,171.46 |
| 1961 | 292,872.29 | 233,000.00 | 60,039.05 |

insurance premiums (less commission and refunds on cancellations) which had been received by Standard but which were not yet due to be paid to taxpayers:

| Taxpayer | Taxable Year | Reported Total Reserves | Total Reserves as Adjusted by the Service | Reserve Ratio as Determined by the Service |
|---|---|---|---|---|
| National Life | 1959 | $204,334.37 | $510,061.22 | 36% |
| United Life | 1959 | 26,561.79 | 83,587.39 | 28% |
| United Life | 1961 | 336,215.63 | 672,426.77 | 48% |

On the basis of this adjustment, taxpayers were not qualified for taxation as life insurance companies.

The district court found both taxpayers qualified for taxation under the reserve-ratio test as life insurance companies for the reason that the attribution of the H & A premiums to taxpayers did not comport with the economics of the reinsurance agreement. He found Standard was the proper party to set up an unearned premium reserve in accordance with insurance accounting practices, and that there are substantial non-tax business reasons for entering into a reinsurance arrangement.

The district court found that, since both taxpayers were unable directly to underwrite H & A insurance in the states involved (because of inadequate capitalization and surplus), they had to engage in a reinsurance arrangement. The reinsurance for H & A policies was on a monthly earned basis because of the surplus drain resulting from having to reserve on the basis of gross unearned premiums. Standard enhanced its liquidity position [4] and minimized its risk [5] by reinsuring on a monthly basis.

Because the parties narrowed the issue to the proper treatment of the H & A reinsurance premiums, the only relevant non-tax purpose cited by the district court is one compelling reinsurance on an earned basis, not reinsurance per se. We agree that avoiding surplus drain was a creditable motivation for reinsuring on a month-to-month basis in the instant case. As a result, taxpayers could not establish an unearned premium reserve, because the premiums were not received until they were fully earned. However, accepting the legitimacy of that purpose does not end the inquiry. The issue raised by the government is not whether taxpayers should actually have established H & A reserves but how such reserves should be considered for the limited purpose of determining taxpayers' qualifying ratio. This is not a question of form over substance but rather one of the proper characterization of the substance.

4. This finding is somewhat puzzling since the asset was offset by the liability to taxpayers. Additionally, Standard had to invest a substantial amount of the fund in Economy debentures and did not receive the interest thereon. This finding could only refer to the payment of claims and expenses in advance of taxpayers' remittances or to an "appearance" of greater liquidity.

5. The district court found that by reinsuring on a monthly basis Standard "thereby substituted a claim against Economy Finance for claims which it otherwise would have had against substantially smaller companies . . . ." It would seem that retaining the unearned premium portion would secure all the insulation possible from taxpayers' instability. We fail to see how investing in Economy Finance debentures adds anything. The substitution of claims was the result of the agreement exacted by taxpayers, not a reason for the arrangement.

### III

#### A. *Insurance Reserves*

Insurance contract premiums are composed of a loading factor and the valuation premium. The loading factor is intended to cover:

"(a) both the specific expense anticipated in providing the respective coverage and an equitable portion of the general expense incurred by the insurer and (b), a margin for an equitable share in any loss of an unpredictable nature which may be experienced by the company in the conduct of its business. The amount of such loading is ordinarily arrived at by arbitrary methods which reflect the judgment of the actuary making the computation." [6]

The valuation premium's purpose varies with the type of insurance coverage. In the case of whole life or endowment policies, the valuation permium is

"(1) to cover the individual policyholder's share of the current year's death claims, and (2) to provide for the accumulation of the funds required for the payment of the face amount of the policy at its ultimate maturity other than by death."

Wightman at 262. Under a term life insurance policy, such as those involved in this case, item (1) above applies but item (2) is not necessary inasmuch as the policy can only mature in the event of death. For health and accident policies, the valuation premium is intended to cover the policyholder's share of the current year's health and accident claims. [7]

Since life insurance companies are defined under the tax code in terms of the reserves they hold, a proper understanding of the nature of insurance reserves is necessary to an understanding of the true basis of income and the objectives of the tax scheme. In insurance accounting, the "reserve" entry is substantially different from conventional accounting reserves; and the two reserves herein involved, the unearned premium reserve and the policy reserve, are substantially different from each other. The method of computing reserves is regulated by the states as a part of their effort to enforce solvency requirements. Reserves are maintained according to such state regulations.

In the simplest sense, reserves are accounting entries which reflect

. . . actual and potential liabilities under outstanding insurance contracts. Since insurance premiums are collected in advance and losses paid out over a period of time, an insurer, assuming premiums were initially adequate, will always have in its possession assets which are "earmarked" for the payment of claims in the future. It would be unsound from an actuarial as well as an accounting viewpoint to look upon these assets as the property of the company or its owners. [8]

For health and accident policies, insurance reserves are of two types, premium reserves and loss reserves. The unearned premium reserve maintained by Standard is a type of premium reserve which is

---

6. E. C. Wightman, Life Insurance Statements and Accounts 261 (1952) [hereinafter cited as Wightman].

7. For life or health and accident policies the valuation premium is computed by reference respectively to a mortality or morbidity table that reflects the appropriate risk attendant to the contract.
   "In the computation of an annual valuation premium, two preliminary calculations are required, namely: (1) the determination of the present value of the promised benefit; and (2) the computation of the present value of the annual payment of a

unit sum (U. S. dollar) for the specified premium-paying period or the life-time of the insured, whichever is the lesser [in the case of life insurance. For health and accident policies, for the specified premium-paying period.] The actual valuation premium is then found by dividing the amount of the present value of the benefit (1) by the present value of the unit payments (2)."
Wightman at 261–62.

8. O. D. Dickerson, Health Insurance 383 (1959) [hereinafter cited as Dickerson].

. . . set up to reflect the liability of the company for losses which have not yet occurred but for which premiums have been paid. Essentially, they represent premiums which have been received but are as yet unearned; that is, the promised protection has not yet been granted.

Dickerson at 384.[9] The H & A policies issued by Standard covered an average of twenty-one months, but the entire premium was paid in advance. To reflect this future liability, which was to be discharged through reinsuring the business with taxpayers, Standard maintained an unearned premium reserve account. If taxpayers had reinsured the entire period of coverage at the outset rather than on a month-to-month basis, they would have been required to set up the unearned premium reserve to reflect their liability to grant protection in the future (*i. e.*, payment of future loss claims). By reinsuring H & A risks on a month-to-month basis, once taxpayers received the reinsurance premiums from Standard they were fully earned in the sense that the protection had been granted.[10]

Most states require that the unearned premium reserve equal the gross unearned premium; in other words, that it "equal all premiums received which apply to periods beyond the valuation date." Dickerson at 385; see n.31, *infra*. Standard maintained its unearned premium reserve on a monthly pro rata basis and remitted the reinsurance premiums on the same basis.

For whole life and endowment insurance policies, the premium reserve is based on the valuation premium as opposed to the entire contract premium used in the calculation of the unearned premium reserve. The premium reserve, entitled the policy reserve, comprises both a premium equalization fund and a sinking fund. The premium equalization fund consists of that portion of the valuation premium designed to equalize mortality costs over the period of the policy to account for the premium amount remaining constant while the mortality risk increases at an accelerating rate. The sinking fund consists of that portion of the valuation premium calculated to provide for payment of the face amount of the policy at maturity other than by death. Wightman at 567–68. The policy reserve demonstrates the dual nature of life insurance, serving both an insurance and a banking function. The equalization fund provides for the cost of the insurance benefit rendered each policy year and the sinking fund is fundamentally a savings account.

> The actual operation would be the same if the insured were to deposit each year in a savings bank (which allowed the same rate of interest on deposits with it as the valuation rate provided in the corresponding insurance policy) the same varying portion of the premium which is required for the terminal reserve under the corresponding endowment or life policy for the respective year and were to purchase a policy from an insurance company running for the corresponding term of years wherein the amount of insurance thereunder in any year would be the difference between the face amount of the corresponding endowment or life policy and the accumulated deposits in the savings bank at the end of the respective policy year.

---

9. "Loss reserves, on the other hand, represent the liability of the company for events which have already taken place but for which settlement is not yet complete. This includes losses where notice has not yet been received, cases in process of investigation, settlement, or litigation, and cases where liability is admitted but benefits are payable over a period of time." *Id.* at 384.

10. At that point, they were only required to set up loss reserves. Taxpayers each maintained two reserves with respect to the H & A policies—one to reflect the present value of amounts not yet due on claims (for approved claims where the date of payment is in the future) and the other to reflect claims that had been incurred but not yet reported.

Wightman at 572. *See also* Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 531–534, 40 S.Ct. 397, 64 L.Ed. 698 (1919).

For term life insurance the policy reserve consists only of a premium equalization fund.

In this case, the policy reserve is, in effect, a deferred credit to the insurer's income, differing in its fundamental character from the unearned premium reserve . . . only by reason of the fact that interest at a pre-determined rate is allowed [in the calculation of the reserve amount] on the accumulation of the temporarily unearned portion of the premiums paid.

Wightman at 567. For the single advance-premium term insurance policies involved here, the reserve consists of both an unearned premium account for the current year and an accumulation fund designed to realize the present value of death benefit costs from the discounted advance payment.

### B. *Insurance Income*

There are two possible sources of income for life insurance companies, from underwriting and from investment. Underwriting income is derived from the excess of gross premiums over expenses and mortality experience. Investment income is derived from the opportunity to invest the long term policy reserve. When the gross premium is calculated, the interest factor at which the policy reserve is required by the regulatory authority to be maintained is employed. This factor is less than normal investments generally return. The company looks at this differential as a source of income.

For insurance companies other than life, no such long term reserve is required, because the probability of the occurrence of the event insured against remains constant over time; no residual benefit (*e. g.*, death benefit, annuity) is contracted for. Once the promised protection has been granted, the premium is fully earned.[11] Thus, when the gross premium is calculated, the short term opportunity to invest unearned premium reserves is not considered significant. Consequently, underwriting income is the primary source of income. *See* 8 Mertens, Law of Federal Income Taxation § 44.17 (1970).

It is this long term investment feature of life insurance companies which mandates special tax treatment. Until the life contract has been completely performed, it is not possible to ascertain the amount of income currently earned. For all other insurance contracts, where the event insured against may never occur and the risk of occurrence is relatively constant, the income derived from each policy period is currently capable of ascertainment. Thus in the instant case, the income taxpayers derived from H & A reinsurance is subject to different tax considerations than that derived from life reinsurance. The problem arises because Congress chose not to tax the earnings from each type of insurance business separately.

Some companies mix with their life business accident and health insurance. It is not practicable for all companies to disassociate those businesses so that we have assumed that if this accident and health business was more than 50 percent of their business, as measured by their reserves, it could not be treated as a life insurance company. On the other hand, if their accident and health insurance were incidental and represented less than 50 percent of their business we treated them as a life insurance company.[12]

The issue presented by this appeal thus becomes a question of which scheme more properly taxes the total business arrangement.

11. Group Life & Health Ins. Co. v. United States, 434 F.2d 115 (5th Cir. 1970), cert. denied, 402 U.S. 944, 91 S.Ct. 1618, 29 L. Ed.2d 112 (1971).

12. Senate Hearings Before the Committee on Finance on Internal Revenue, 67th Cong., 1st Sess. 85 (1921).

## IV

A life insurance company is defined in terms of a reserve-ratio qualification test. Section 801(a) provides:

Life insurance company defined.— For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b))[13], plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprises more than 50 percent of its total reserves (as defined in subsection (c)).[14]

The qualifying fraction can be expressed in simplified terms as follows:

*Qualifying reserves (numerator)*

1. Tabular reserves on life, annuity, and noncancellable accident and health policies

2. Unearned premiums on noncancellable life, health, or accident policies not included in (1)

3. Unpaid losses on noncancellable life, health, or accident policies not included in (1).

*Total reserves (denominator)*

1. Tabular reserves on life, annuity, and noncancellable accident and health policies

2. Unearned premiums not included in (1)

3. Unpaid losses not included in (1)

4. All other insurance reserves required by law.

Alinco Life Ins. Co. v. United States, 373 F.2d 336, 350, 178 Ct.Cl. 813 (1967).

Section 802(b) defines life insurance company taxable income as:
The lesser of: (1) taxable investment income [15] or (2) the gain from operations [16]
+ 50% of the excess of gain from operations
+ the amount subtracted from policyholders surplus
= Life Insurance Company Taxable Income (subject to tax at the normal corporate tax and surtax rate, 26 U.S.C. § 802(a)(1))[17]

---

13. Section 801(b) defines life insurance reserves in pertinent part as follows:

(1) In general.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

14. See notes 14, 15, 16, 17 on page 476.

It can be seen that when gain from operations exceeds taxable investment income, underwriting income basically constitutes the excess.[18] The taxed 50 percent of gain from operations is added to the shareholders surplus account, 26 U.S.C. § 815(d). The untaxed 50 percent of gain from operations is added to the policyholders surplus account (26 U.S.C. § 815(c)),[19] which amounts are taxed only if and when they are distributed to shareholders. 26 U.S.C. § 815(a), (d)(1). As the government has noted, "[T]he immediate deferral of 50 percent of the underwriting income and the deduction amounts and the corresponding taxation of those amounts only when and if the company takes appropriate actions represents perhaps the major benefit (on an overall industry basis) flowing from qualification as a life insurance company."

Although taxpayers did not take advantage of the 50 percent deferral of

14. Section 801(c) defines "total reserves" as:
  (1) life insurance reserves,
  (2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and
  (3) all other insurance reserves required by law.

15. Section 804 defines taxable investment income essentially as that portion of the return on investments which is not applied to the company's insurance reserves ("the policyholders' share of any item shall be that percentage obtained by dividing the policy and other contract liability by the investment yield"). See United States v. Atlas Ins. Co., 381 U.S. 233, 239, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965).

16. Section 809 defines gain from operations to include both the company's share of investment yield and underwriting income. See Jefferson Standard Life Ins. Co. v. United States, 408 F.2d 842, 845 (4th Cir. 1969).

17. The taxpayers reported the following amounts on their tax returns pursuant to 26 U.S.C. § 802(b):

| | | National Life 1959 | United Life 1959 | United Life 1961 |
|---|---|---|---|---|
| 1. | (a) Taxable investment income | 4,685.66 | 1,853.62 | 19,385.88 |
| | (b) Gain from operations | 348,579.59 | 106,080.98 | 16,808.92 |
| | (c) Smaller of (a) and (b) | 4,685.66 | 1,853.62 | 16,808.92 |
| 2. | 50% of excess of 1(b) over 1(a) | 171,946.96 | 52,113.68 | –0– |
| 3. | Amount subtracted from policyholders' surplus account | 182,554.67 | 49,019.42 | –0– |
| 4. | Life insurance company taxable income (total of lines 1(c), 2, and 3) | 359,187.29 | 102,986.72 | 16,808.92 |

18. "The amount remaining is here referred to as underwriting gain since it in large part consists of mortality and loading savings . . . . In addition, however, what is here called underwriting income may also include minor amounts of investment income, since under phase 2 the life insurance company's share of the investment yield taken into account is determined on the basis of the company's own assumptions as to the interest required to be added to reserves rather than on the basis of the interest which would be added to reserves if based upon the 5-year average of the company's earnings rate." S.Rep.No.291, 86th Cong., 1st Sess. 20–21, U.S.Code Cong. & Admin.News 1959, p. 1594.

19. In the determination of gain from operations, certain deductions are allowed under 26 U.S.C. § 809(d). The deductions pertaining to nonparticipating contracts (§ 809(d)(5)) and H & A insurance and group life insurance (§ 809(d)(6)) are also added to the policyholders surplus account. 26 U.S.C. § 815(c)(2)(B) and (C).

gains from operations in the years in question,[20] this potential offers a substantial tax benefit. Deferral is allowed because of the inability of the life insurance business accurately to determine current income and the only reason H & A underwriting income is accorded such deferral is that it is earned in conjunction with primarily life insurance business. The deferral is allowed as a matter of convenience only.

Taxpayers' reserve ratio would lead one to the conclusion that they were almost exclusively in the life insurance business. Nevertheless, taxpayers also conducted a substantial H & A reinsurance business during the taxable year. Thus, a literal interpretation of & 801(a) requirements in this instance fails to effectuate the objective of the prescribed test, namely, the identification of the business conducted. Therefore, the H & A portion of taxpayers' business must be scrutinized in order to determine the source and significance of the resulting distortion when the reserve qualification formula is literally applied.

By defining life insurance companies in terms of the reserves they hold, Congress identified the fund which represents *inter alia* nonexcess risk. Ignoring for our purpose the fact that H & A reserves also include loading, Congress compared the actuarial estimate of the amount necessary to cover life contract obligations with the amount necessary to cover H & A obligations. By identifying the holder of nonexcess risk, it would also identify the holder of excess risk and presumably there is a correspondence between the stated amount of nonexcess and excess risk exposure. Hence the larger the amount of nonexcess risk, the larger the excess risk exposure.

For life insurance it is the existence of excess risk not currently ascertainable which mandates the deferral of 50 percent of gains from operation.

The reason that the reserve-ratio test literally applied to the present insurance arrangement has failed to reflect the H & A reinsurance business is because this is not a true reinsurance situation but, as taxpayers' expert testified, a hybrid. Reinsurance is undertaken to spread the risk such as in the risk premium reinsurance arrangement or to offset surplus drain as for example in coinsurance arrangements. In either case, reinsurance includes the assumption by the reinsurer of the attendant nonexcess and excess risks. Here, the taxpayers admittedly sought surplus aid but they also desired to function as the insurer on these H & A policies, business which other related taxpayers generated. As a result, the reinsurance treaties served an interim loan function but did not serve to spread the insurance risk.

The H & A reserves in Standard's hands were employed in precisely the same manner as they would have been in taxpayers' possession—for servicing expenses, claims settlement, and other related expenses.[21] Standard did not even retain the right to the return on the investment of these reserves during the period of retention. The testimony established that Standard's interest was in the commissions it received which were not affected by the claims experience, that is, the insurance risk.[22] Standard's economic interest was in the continuance of the commission income, not in the unearned premium reserves. Plaintiffs' witness, Mr. Harry V. Wade, Standard's chief executive officer, testified that Standard's only exposure to risk was in

---

20. In 1959, National Life distributed all and United Life distributed most of the policyholders' surplus presumably to take advantage of a transitional tax reduction then allowed under 26 U.S.C. § 802(a)(3). In 1961, the net earned premiums as included in gain from operations were fully included in United Life's taxable income because an underwriting loss (when coupled with special

life insurance company deductions, 26 U.S.C. § 809(d)) was suffered.

21. *Cf.* Superior Life Ins. Co. v. United States, 462 F.2d 945 (4th Cir. 1972).

22. Plaintiffs' witness, Mr. Wade, testified that Standard's interest in claims allowance related only to taxpayers' solvency, not Standard's profitability. Tr. 161–62.

the event of taxpayer's insolvency.[23] The commission income should be considered as consideration for surplus aid, policy servicing, and exposure to the insolvency risk. Other than the insolvency risk which is not a risk considered in the reserve-ratio test, Standard performed a banking and clearing-house function and not an insurance function. We think taxpayers would agree with our analysis if the treaty did not contain a right to cancellation of the H & A treaty. The cancellation provisions do not affect our determination that for tax purposes the reserves measure taxpayers' business because even in the event of cancellation Standard was not exposed to excess risk.[24] It is exalting form over substance to state that in the event of cancellation Standard would be the insurer on the H & A policies because they were exposed to nonexcess risk alone. Standard would use the premiums paid by policyholders (no interest was assumed on the calculation of the reserve) to pay claims and expenses and the 1.7 percent commission; Standard would receive any morbidity or loading savings above those amounts; and, if the unearned premium reserve was insufficient, Standard had recourse against taxpayers up to 10 percent of the total premiums earned during the preceding year. To treat Standard as the insurer where there are no economically realistic downside risks in the event of cancellation confounds our understanding of the insurance business.

As an alternative ground for attributing the H & A reserve to taxpayers, the government argues that the cancellation provisions should have no tax consequences because there is no realistic likelihood of cancellation. We agree that these provisions lack economic substance for tax purposes considering the income and loan benefit to various other Schloss enterprises, the declining balance of the H & A reserves,[25] and the fact that upon cancellation taxpayers would be in the anomalous position of having no right to any profit but would be liable to the extent of 10 percent of the total premiums earned during the preceding year in the event of excessive losses. We do not believe, as the dissent suggests, that our conclusion equates the right to cancel "with a legal obligation not to do so." To determine that a feature of a transaction has no tax significance is not tantamount to a determination that taxpayers cannot do something, only that they will not. The distribution of risks in the event of cancellation merely shows that the parties did not intend the provision to have nontax significance except insofar as they allowed Standard to hold the reserves in order to minimize its risk with respect to the surplus aid. The fact that the state insurance authorities required or permitted Standard to hold the reserve for sol-

23. Primary insurers will always bear an insolvency risk in the case of insurance ceded. Nevertheless, the primary insurer is not considered on the risk for reserve requirement purposes.

24. Although it would appear that taxpayers' exposure to excess risk was limited, we think this "limitation" was liberal enough virtually to insure full reimbursement to Standard in the unlikely event of cancellation. Taxpayers' expert testified that loss experience was about 30 percent of each dollar premium; further, the premiums were reserved on a pro rata rather than a declining balance basis. Hence it would be unlikely that losses would exceed this limitation. If the parties actually intended the reinsurance to be on a strict month-to-month basis, we can perceive no reason for taxpayers to expose themselves to excess risk on insurance they had not assumed. The fact that they did gives rise to the inference that they intended the risks to shift and the 10 percent figure was considered adequate to do so.

25. Although the reserves were maintained and remitted on a pro rata basis, the risk element is constantly declining, resulting in a correspondingly increasing amount of loading in each earned premium on policies in force. Taxpayers argue that this consideration is insubstantial because the earned premiums were net commissions, the principal loading element. This contention is tantamount to stating that the profit element they accepted was not excessive. Regardless of its sufficiency, taxpayers' profit element increased over the term of each H & A contract.

vency purposes does not answer the question of whose business the reserves measure. Nor is it necessary to disturb the business arrangement between the parties in order to hold that the H & A reserves measure taxpayers' business for purposes of the qualification test.

Taxpayers rely on Penn Security Life Ins. Co. v. United States, No. 109–68 (Ct.Cl., March 2, 1973), and First Railroad & Banking Co. v. United States, Civil No. 1738 (S.D.Ga., April 9, 1973), unofficially reported at 31 AFTR 2d ¶ 73–509, at 73–1162. In *Penn Security* the court was presented with a credit reinsurance arrangement essentially identical to the present case. Relying on the district court decision in this action, it held for the taxpayer-plaintiff. Obviously such circular reliance is of no support to taxpayers since we have rejected the district court's reasoning.

In *First Railroad*, the I.R.S. sought to include a wholly owned subsidiary in the consolidated return of the parent for the reason that the wholly owned subsidiary, which conducted a credit life and H & A insurance business, did not qualify as a life insurance company. The disallowance of § 801(a) treatment was due to a reinsurance arrangement whereby the subsidiary ceded to its parent 60 percent (later 70 percent) of the total premiums on all H & A insurance policies. This practice reduced the proportion of H & A reserves held by the subsidiary. The treaty provided for a quota share assumption of the liability, but the commission arrangement resulted in only a remote possibility of the parent's actual risk of loss.

> In order for it [the parent] to sustain permanent out of pocket losses on liability under the subject policies, there would have to be valid claims exceeding 96% of the reinsurer's earned premium, and additionally, [the subsidiary] . . . would have to be insolvent so as to preclude recapture of those losses in subsequent accounting periods.

31 AFTR 2d at 73–1164. The court found that despite the "transfer of minimal risk . . . there were substantial non-tax purposes for entering into the arrangement" and that "[t]he advantages accruing to [the subsidiary] . . . would have been the same regardless of the reinsurer." 31 AFTR 2d at 73–1164–65.

Not all the nontax purposes cited in *First Railroad* are involved in this case; those common to both cases we do not clothe with the same significance as that court did.

As stated above, in true reinsurance situations, surplus aid includes the assumption by the reinsurer of the attendant insurance risk including the risk of excessive losses. In *First Railroad,* the subsidiary through reinsurance commission adjustments effectively remained on the risk. It merely received "surplus loans" at the time the reserves were set up and in the event of excessive losses. The subsidiary paid for these loans at an "interest rate" of 4 percent of earned premiums; the parent always received any outstanding amounts of "principal" through the adjustment of the subsidiary's "commission." In the instant case, the H & A reinsurance likewise did not serve to spread insurance risks; the surplus aid served an interim loan function. *See* Kimball & Denenberg, Insurance, Government and Social Policy 187 (1969).

The fact that reinsurance provides additional protection for policyholders does not relate to the question of whose business the reserves actually measure. This feature only serves to emphasize the fact that, with reinsurance of the type involved in *First Railroad* and in taxpayers' business, more than one company may eventually be exposed to some risk. But only one company can and must maintain the reserves related to the premiums in their possession. For example, in the present case Standard would have been liable on the credit life insurance policies in the event of taxpayers' insolvency; nevertheless, it would be inappropriate to suggest that taxpayers cannot hold the life insurance reserves by reason of this insolvency

**480**

possibility. Because the H & A treaties granted only an illusory right to escape future liability through cancellation, Standard's only risk of exposure to any insurance risk was via its insolvency risk, the same exposure posture it held with respect to the life insurance policies. The definition of reserves for tax purposes simply does not encompass an insolvency risk.

Finally, Standard did not receive any investment income as did the parent in *First Railroad*.

Insofar as *First Railroad* supports the proposition that nontax purposes for entering into a reinsurance arrangement are sufficient to avoid further analysis in terms of the objectives of § 801(a), we decline to follow it.

█ From the foregoing economic arrangement, we conclude that for purposes of qualification as a life insurance company, the unearned premium reserves are attributable to taxpayers.[26]

### V

Having found the H & A reserve attributable to taxpayers for tax purposes, it is necessary to pass on two alternative contentions not reached by the district court.

#### A. *Cancellability of H & A Insurance*

Taxpayers argue that the H & A coverage is "noncancellable" as that term is used in § 801(a). The significance of this argument is that, for purposes of the reserve ratio test, unearned premium reserves on noncancellable H & A coverage are includible in both the numerator and the denominator of the reserve franction, whereas all other H & A coverage is includible only in the numerator.

Where an insurer is contractually bound to a long term noncancellable or guaranteed renewable H & A policy in exchange for a level annual premium, it faces an investment requirement similar to life insurance coverage. While over a short term the health of the policyholder is relatively constant, over a long term the insurance risk increases. Consequently, the company must set up a reserve in addition to the unearned premium reserve, that is, an equalization fund. *See* Massachusetts Protective Ass'n v. United States, 114 F.2d 304, 309 (1st Cir. 1940). In 1942, Congress provided that, in determining whether an insurer should be taxed as a life insurance company, noncancellable H & A contracts should be considered to be a part of the insurer's business which was in the nature of life insurance. Revenue Act of 1942, ch. 619, § 163, 56 Stat. 798. The type of noncancellable policy in contemplation and the reserves attendant thereto were set out by the Senate Finance Committee:

> Since noncancellable contracts of health and accident insurance require the accumulation of substantial reserves against increased future risks, the writing of such insurance is analogous to life insurance and the definition has been changed to permit such companies to be taxed as life insurance companies. The unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are added to such reserves in determining whether a company is to be considered a life insurance company. The life insurance reserves defined in subsection (c)(2) as they pertain to noncancelable health and accident insurance policies are those amounts which must be reserved, in addition to unearned premiums, to provide for the additional cost of carrying such poli-

---

**26.** *Cf.* Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L. Ed.2d 1360 (1959).

The precise manner in which unearned premiums are held is not controlling, because unearned premium reserves includible in the qualification ratio need not be required by law. Treas.Reg. § 1.801–3(e).

Standard's retention of the H & A unearned premium reserves will not result in double taxation of the transactions relevant to the H & A business. Standard will be required to take into income only the commission income and taxpayers will be liable for the underwriting income proper.

cies in the later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums then being received. As the term is used in the industry, a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation.

S.Rep. No. 1631, 77th Cong., 2d Sess. 144–45 (1942).[27] In the present statute, this change is reflected in § 801(a)(2).

Plaintiffs attack Treasury Regulation § 1.801–3, which defines "noncancellable" for purposes of the insurance company qualification ratio, as an invalid exercise of the Treasury's rule-making authority because it has no support in the legislative history of § 801. Treasury Regulation § 1.801–3 provides in pertinent part:

(c) *Noncancellable life, health, or accident insurance policy.* The term "noncancellable life, health, or accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation. . . .

We do not perceive how this regulation can be said to lack legislative support with regard to the relevant feature—namely, a policy "with respect to which a reserve in addition to the unearned premiums . . . must be carried to cover that obligation." It is the necessity of an equalization fund in long term H & A coverage which compels the same treatment as that accorded life insurance reserves. Taxpayers did not establish an equalization fund in addition to the unearned premium reserves because the change in policyholders' health over the term of these policies was, as plaintiffs' expert testified, imperceptible.

Taxpayers argue that, although a separate "additional reserve" is not established, the obligation is built into the net premium (morbidity element) and thus into the unearned premium reserve. If the change in health is imperceptible, it is not apparent why a factor designed to equalize the cost of carrying the insurance risk would be included when that risk remains constant. Even assuming that taxpayers built a factor into the premiums for increasing risk over time, this must have been in effect a charging of a "nonlevel" premium since no interest was expected on the temporary accumulation under the debenture arrangement. This factor differs substantially from the usual equalization fund, which depends on investment returns to insure the adequacy of the reserve against contract obligations. The interest portion necessary for policy obligations is recognized as an integral part of such reserves and therefore exempted from tax.[28]

---

27. *See generally* United Benefit Life Ins. Co. v. McCrory, 414 F.2d 928 (8th Cir. 1969), cert. denied, 396 U.S. 1039, 90 S.Ct. 687, 24 L.Ed.2d 684 (1970).

28. Where H & A policies are noncancellable in the sense that an additional reserve is required to be maintained, it appears that, although the entire unearned premium reserve is to be taken into account in determining whether an insurance company qualifies as a life insurance company under § 801(a) (Rev.Rul. 69–270, 1969–1 Cum.Bull. 185),

only the "reserve in addition to unearned premiums" on noncancellable or guaranteed renewable H & A contracts may be treated as a life insurance reserve for purposes of computing the policyholders' share of investment yield under § 804 and § 805(a)(1). Rev.Rul. 70–460, 1970–2 Cum.Bull. 135.

This interpretation is in harmony with legislative intention when Congress first determined that the equalization fund aspect of noncancellable H & A policies mandated special treatment.

Taxpayers further contend that in the insurance industry "noncancellable" means a policy which the insurance company cannot cancel and that Congress intended the meaning attached by the business which evolved the term. But Congress was specific as to the combined features of a "noncancellable" policy for tax purposes. Taxpayers' policies do not fit within the framework of the statutory definition.[29]

Plaintiffs also argue that since the H & A coverage could only be obtained if life insurance was also purchased, this constitutes a "health and accident contract combined with a life insurance . . . contract." Even assuming these were combined contracts, taxpayers still fail to meet the equalization fund requirement. See Rev.Rul. 60–54, 1960–1 Cum.Bull. 266. This requirement is perfectly consistent with the tax objective of § 801 and the expressed intent of Congress.[30] Group Life & Health Ins. Co. v. United States, 434 F. 2d 115 (5th Cir. 1970), cert. denied, 402 U.S. 944, 91 S.Ct. 1618, 29 L.Ed.2d 112. *See also* Rev.Rul. 71–367, 1971–2 Cum. Bull. 258 (H & A policies do not qualify as guaranteed renewable during the first three years where reserves consisted of only gross unearned premiums but qualify thereafter where additional separate reserve established).

B. *Correct Measurement of the Unearned Premium Reserve*

■ Taxpayers' final contention is that only the morbidity portion (net premium) of unearned premium reserves should be added to the denominator (to-

tal reserves) of the reserve-ratio fraction. They argue that, since the life insurance reserves included in the ratio are based on net premiums (mortality element), including only the morbidity element of H & A unearned premium reserves is the only way to provide an adequate basis for comparison of the two types of businesses represented by reserves.

"Total reserves" are defined as "(1) life insurance reserves, (2) unearned premiums, and unpaid losses . . . and (3) all other insurance reserves required by law." 26 U.S.C. § 801(c). Treasury Regulation § 1.801–3(e) defines unearned premiums as "those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance."

Revenue Ruling 69–270 (1969–1) Cum. Bull. 185), dealing with qualification under § 801(a), cites numerous cases holding that "[t]he term 'unearned premiums' has long been established as being the full amount of the pro rata unearned premiums, unreduced by 'loading.' " The ruling concludes that "[t]he definition of 'unearned premiums' in section 1.801–3(e) of the regulations is substantially similar to that considered in the cases cited above where the courts, in discussing unearned premiums, considered them to be the full pro rata gross unearned premiums." Furthermore, insurance regulators universally consider the entire pro rata portion of gross H & A premiums which apply to periods beyond the valuation date as "unearned." Consequently, insurance companies do

---

"Technical changes are made . . . to emphasize the fact that the unearned premiums and unpaid losses on noncancellable life, health, or accident policies, not included in life insurance reserves, are included *for purposes of the definition of a life insurance company only*." S.Rep.No.1631, 77th Cong., 2d Sess. 144 (1942) (emphasis added).

29. *See also*, Rev.Rul. 60–54, 1960–1 Cum. Bull. 266, involving insurance contracts similar to those in this case. Contracts not terminable at the company's option do not qual-

ify for life insurance reserves where there is no equalization fund obligation.

30. We need not reach plaintiffs' argument that a termination date of 60 years or over is arbitrary since the policies in issue do not meet the additional reserve requirement. See Rev.Rul. 56–476, 1956–2 Cum.Bull. 468, which suggests that the Service was under the impression that it was expanding the definition of noncancellable in accordance with industry practice by including contracts which specified a termination date.

not hold morbidity reserves, they hold unearned premium reserves.[31]

The conclusion of Revenue Ruling 69–270 implies that the phrase "cost of carrying the insurance risk" was inartfully employed[32] in Treasury Regulation § 1.801–3(e). Since we can find no instance where unearned premium reserve and the morbidity portion of the contract premium are used synonymously, we conclude that Congress intended to adopt the only definition attached to "unearned premium reserve" by the industry.[33]

## VI

We conclude that taxpayers do not qualify as life insurance companies for purposes of taxation because the unearned premium reserves are attributable to them in the reserve-ratio qualification test as computed by the government. They are properly taxable as insurance companies other than life.

Reversed and remanded for proceedings consistent with this opinion.

STEVENS, Circuit Judge, (dissenting).

Congress could have selected any one of several different tests for deciding when the life insurance portion of a company's business is sufficient to characterize the enterprise as a "life insurance company" for tax purposes. It might have used the number of life policies written, the amount of premium income, the face value of its policies, or possibly some combination of different yardsticks.[1] Instead, it chose to attach significance to the relative importance of the company's life insurance reserves.

Perhaps another test would have been preferable, but the reserve-ratio test does have certain advantages. Insurance companies are regulated by state authorities who require them to maintain adequate reserves. There is, therefore, an independent basis for believing that the amount of an insurance reserve is a realistic measure of the insurance risks the company has been paid to assume. For the reserve is not appropriate until the company (a) has assumed the risk, and (b) has been paid for assuming that risk. The amount which it is paid, usually in the form of a premium which has not yet been earned because it applies to future risks, provides the company with the wherewithal to acquire the assets to hold in reserve.

The test supplied by Congress to identify a life insurance company is a rather simple one and, as I understand it, these taxpayers passed it. If over half of an insurance company's total reserves consist of "life insurance reserves,"[2] it is a

---

31. "Basing the reserve on gross rather than net premiums implies the assumption that expenses, like losses, are spread uniformly over the life of the policy. This is, of course, incorrect. By far the greatest portion of expenses are incurred at, or shortly after, the issuance of a policy. Commissions, underwriting, policy-writing, and group installation expenses are largely incurred and paid roughly at the time of issue. Since these expenses have already been paid, it is unnecessary to set up a reserve for their future payment. However, state laws require reserving on a gross premium basis. Thus the reserve is larger than it otherwise need be, and the earnings and surplus are understated as a result." Dickerson at 386–87.

32. If interpretation of the Treasury Regulation were strictly limited to the words "cost of carrying the insurance risk," this would encompass only the loading portion. If the regulation were to buttress taxpayers' argument, it would have to read "cost of the insurance risk." To accord with congressional intent and the industry's definition, it should read "cost of carrying the insurance risk plus the cost of the insurance risk."

33. *Cf.* Superior Life Ins. Co. v. United States, 462 F.2d 945, 951 (4th Cir. 1972).

1. It would surprise me if Congress should select a yardstick defined in terms of the amount of premiums received by a third party, rather than by the taxpayer, without setting forth a further test to indicate when "the arithmetic mean as of the beginning and end of each year" of the third party's revenues should be treated as though they belonged to the taxpayer.

2. The statutory definition also permits "unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable

life insurance company within the meaning of the statute. In this case about 90% of the taxpayers' total reserves were life insurance reserves, and therefore they passed the statutory test by a comfortable margin.

The government does not dispute taxpayers' calculation of the amount of their life insurance reserves. For each taxpayer, however, the government argues "its" life insurance reserves were less than 50% of *"its"* total reserves" [3] because the total reserves as reflected on its balance sheet should be increased to include a reserve for unearned premiums on health and accident insurance written by Standard. If I correctly understand the government's argument, it rests on two incorrect assumptions: (1) an implicit assumption that taxpayers receive unearned premiums on their health and accident business; and (2) an express assumption that taxpayers were at all times " 'fully' on the [health and accident] risk."

For purposes of anlysis we may treat Standard as the taxpayers' only customer and note that they sold only two kinds of policies to Standard. We may assume that a prototype of each policy provided insurance protection of $7,000 for a period of 21 months at a premium cost of $210. With respect to the life insurance policy, the full $210 premium was paid by Standard to taxpayer at the beginning of the policy term. At the outset taxpayer was therefore in possession of a $210 asset which had not yet been earned, but which was available to support a reserve liability of no more than $210. Such a reserve could then be amortized as the already-collected premium was earned at the rate of $10 per month.

With respect to the health and accident insurance, however, the full premium was not paid to taxpayer by Standard at the beginning of the term. The premium was paid as it was earned—in our example, at the rate of $10 per month. Since taxpayer did not receive any unearned premium on its health and accident business, it had no occasion to set up any reserve against unearned premiums.

On their life insurance business taxpayers could not terminate their risk by cancellation of a policy before the expiration of its term. They were therefore required by applicable state law to maintain, and did in fact maintain, life insurance reserves against the unearned premiums which they had collected. On the health and accident business, however, they retained an unqualified cancellation right and did not assume any present risk on the unearned or unexpired portions of the policies. They were not required by state law to maintain, and did not maintain, health and accident reserves against risks they did not assume and for which they had collected no premiums.

Unlike the taxpayers, Standard, as the primary insurer, was required to maintain reserves with respect to health and accident policies which it had sold to customers of the finance companies. It was essential for Standard to maintain such reserves because it received the entire premium on such policies when they were issued and, only as those premiums were earned, did Standard use those funds to purchase re-insurance coverage from the taxpayers. Standard was the only insurer on the unearned, future portions of the health and accident risk for which premiums had been paid to Standard but not to taxpayers. Whether we apply the reserve ratio test to reserves which taxpayers actually maintained, to the reserves which they were required by state law and by good ac-

---

life, health, or accident policies" to be treated as life insurance reserves for definitional purposes, but that component of the formula may be disregarded in this case since about 90% of each taxpayer's total reserves consisted of life insurance reserves.

3. The quoted words are from the test prescribed by Congress in § 801(a). See Judge Sprecher's opinion, text at footnote 13.

counting practice to maintain, or to risks that they actually assumed *at any relevant point in time* against which reserves might appropriately have been created, I find no basis for calculating taxpayers' ratio of life insurance reserves as less than half of their total reserves.

I disagree with the government's conclusion that taxpayers were fully on the health and accident risk at all times. The government's conclusion depends on the suggestion that taxpayers' cancellation rights under the health and accident treaties were "illusory." I may misunderstand the suggestion, but it seems to rest on two quite different grounds. First, in essence, the government seems to claim that notwithstanding the fact that Standard and taxpayer were independently owned and dealt with one another at arm's length, the economics of the entire arrangement made it so unlikely that either taxpayer would ever cancel its health and accident re-insurance treaty that its clear right to do so should be equated with a legal obligation not to do so.[4] In my opinion, the contractual language should be accepted as controlling.[5]

Second, the government may read the health and accident treaty as imposing the entire risk on taxpayer in the event that cancellation should occur. It is true that under Article IX the taxpayer accepted some of the risk on claims arising subsequent to cancellation, but the amount of the risk so accepted is limited to 10% of the total health and accident premiums earned by taxpayers during the one-year period prior to cancellation of the treaty. This exposure is, of course, far short of being "fully" on the risk. Indeed, it is quite clear that even if the taxpayers had been required to increase their total reserves in an amount sufficient to reflect 100% of this contingent liability, such an increase would not have been nearly sufficient to make the total reserve twice as large as the life insurance reserve.[6]

In sum, I am persuaded that the government's conclusion that life insurance represents less than half of taxpayers' total insurance business rests on a non-statutory standard. Congress may have acted unwisely in giving preferential tax treatment to life insurance companies, and it may have been unwise to select a reserve-ratio test as the definition of a life insurance company for tax purposes. Nevertheless, we must, of course, apply the test which Congress has specified. Although I do not question the majority's conviction that it is doing so faithfully, I am afraid the holding may ac-

4. At page 20 of its brief, the government argues that "the cancellation provisions grant taxpayers only an illusory right to avoid the risks." On the next page of its brief, purportedly stating the same legal conclusion in a different way, the government emphasizes evidence which "negates any reasonable likelihood that taxpayers would ever cancel."

5. Even if we accept the government's theory that we can safely predict that neither the taxpayers nor Standard will ever cancel the health and accident re-insurance treaties, and therefore taxpayers will continue to assume the risks on the health and accident policies as the premiums are earned, I would not ignore the anomaly of creating a hypothetical balance sheet on which taxpayers have a large reserve liability which is not matched by any cash or other asset reflect-

ing the receipt of unearned premiums. Necessarily, the government not only attributes Standard's reserves to the taxpayers, but also must treat them as though they had received the entire health and accident premiums at the beginning of the policy terms instead of on a monthly basis as the premiums are earned.

6. As an illustration, plaintiff's Exhibit 14 indicates that Standard paid $285,574.23 of health and accident premiums to United in 1961. Under the cancellation provisions of the reinsurance treaty, United therefore had a maximum contingent liability of $28,557.42 on the unearned portion of the health and accident risk. Even if this full amount were added to its reported total reserves of $336,215.63, its life insurance reserves, which amounted to $322,055.00, would be over 88% of the total.

tually rest on an amalgam of substitute tests that will be difficult to apply in other cases.[7]   I therefore respectfully dissent.

7. The principal element in the crucible appears to be an emphasis on the long-term investment income potential associated with "the dual nature of life insurance, serving both an insurance and a banking function." I do not understand, however, that term life insurance—which is the only kind of life insurance involved in this case—serves any such banking function. I am therefore in-clined to believe that any analysis based on an attempt to effectuate the majority's understanding of the underlying rationale for special tax treatment for life insurance companies—rather than the statutory language selected by Congress—would lead to the disqualification of any company writing nothing but term life insurance.