NATIONAL STATES INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17289-79.     Filed September 19, 1983.

---

*W. Bruce Springer* and *Dave L. Cornfeld*, for the petitioner.
*Seymour I. Sherman*, for the respondent.

WILBUR, *Judge*: Respondent determined deficiencies and an addition to petitioner's Federal income taxes as follows:

| Year | Deficiency | Addition to tax under sec. 6653(a) |
|------|-----------|-----------------------------------|
| 1973 | $56,556.24 | |
| 1974 | 169,687.01 | $8,484.35 |
| 1975 | 157,315.55 | |
| 1976 | 177,534.31 | |

After concessions, the sole question presented for decision is whether petitioner qualified as a life insurance company during the years in issue under the provisions of section 801(a).[1] Specifically, we must decide whether petitioner's individual accident and health policies were "guaranteed renewable" within the meaning of section 1.801–3(d), Income Tax Regs.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found. The stipulation and the exhibits attached thereto are incorporated by this reference.

Petitioner is a Missouri corporation engaged in the business of issuing policies of insurance, with its principal office in University City, Mo. It filed its Federal income tax returns for each of the calendar years 1973 through 1976 with the Internal Revenue Service Center at Kansas City, Mo., on Forms 1120L, together with the annual convention statement for each year.

Petitioner was incorporated in 1964 as a life insurance company under the law of the State of Missouri. Petitioner underwrites insurance in numerous States. During the taxable years in controversy, it primarily wrote guaranteed renewable

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise stated.

health and accident insurance policies (hereafter GRHA policies) and a small amount of life insurance and group accident and health insurance. Petitioner did not issue policies of insurance other than life, accident, and health insurance.

Under the terms of the individual accident and health policies written by petitioner (with minor exceptions not here material), petitioner may neither cancel nor refuse to renew coverage for life or to age 65, at a level premium. Petitioner may, however, adjust premiums by class based on experience, but at rates based upon the age and insurable condition of the insured at the original date of issue. No changes in premium rates may be based on the insured's increased age (from the time the policy was first issued), changes in health or occupation, or claims made under the policy.

Guaranteed renewable individual accident and health policies are a recognized product type within the health insurance industry. For purposes of classification by the insurance industry, the contractual provisions described in the preceding paragraph distinguish a guaranteed renewable individual accident and health policy from other forms of health and accident insurance. All of petitioner's individual GRHA policies satisfy the industry definition and understanding of the guaranteed renewable product type.

All of petitioner's GRHA policies are level premium policies, as distinguished from step-rate or 1-year term policies. A level premium policy is one under which the premium is based on original issue age, and does not increase based on attained age (although the insurer may adjust premiums by class under the guaranteed renewable provision). A step-rate policy is one under which the premiums provided for in the contract increase at specified periods based on attained age.

Guaranteed renewable level premium policies, which came into use in the early 1950's, provide the insured with the benefit of a premium rate unaffected by changes in age and condition of health, but also enable the insurer, through its ability to change premium rates by class, to cope with inflation and changes in health care standards affecting claim costs. These policies, like policies of life insurance, present long-term hazards extending beyond the current premium payment period. The requirement of a reserve, in addition to the

unearned premium reserve, recognizes that long-term or continuing risk.

At all times here relevant, petitioner was subject to regulation, supervision, and examination under the insurance laws of the State of Missouri by the Missouri Insurance Division, which was charged by State statute with the execution of laws in relation to insurance companies doing business in Missouri.

The Missouri minimum valuation standard classifies accident and health policies as type A, type B, type C, or type D, depending on the nature of the policy provisions. Type B policies are described therein as follows:

B. Policies which are guaranteed renewable for life or to a specified age * * * but under which the company reserves the right to change the scale of premiums.

With immaterial exceptions, all petitioner's individual GRHA policies satisfied the above-quoted definition of a type B policy.

As a minimum reserve standard for type B policies, the Missouri minimum valuation standard authorized use of one of the following three generally recognized reserve methods:

(1) Mean reserves diminished by appropriate credit for valuation net deferred premiums;

(2) Mid-terminal reserves plus gross pro rata unearned premium reserves;

(3) Mid-terminal reserves plus net pro rata unearned premium reserves.

In 1973 through 1976, petitioner estimated its active life reserve on its individual accident and health policies using method (2) referred to above.

Active life reserves are reserves for future claims or liabilities not yet incurred; "claim reserves" are for claims and liabilities already incurred, but not yet paid. Active life reserves include (a) the "unearned premium reserve," which is a reserve for claims or liabilities which will be incurred during the remainder of the term or period for which the premium has been paid, and (b) the "additional reserve," generally designated as the "mid-terminal" reserve in technical insurance terminology, which is a reserve for claims or liabilities that will be incurred after the end of the current premium period. This additional or mid-terminal reserve is normally concerned only with policies which place on the insurer a risk

extending beyond the current premium payment period for which future premiums at some point will be inadequate.

Premiums are treated as earned by the passage of time. A pro rata unearned premium reserve, whether gross or net, diminishes as time passes, and is necessarily reduced to zero at the end of the current policy term or premium payment period. The mid-terminal or additional reserve represents an amount held back or reserved from premiums which would otherwise be treated as earned, and remains at the end of the current premium or policy term when the unearned premium reserve is at zero.

The gross premium is the total premium actually paid by the insured. It consists of (a) the net premium or net valuation premium, which, with assumed earnings, is the amount deemed necessary to meet claims and obligations arising under the policy, and (b) the "loading" factor, which is required to pay commissions, taxes, and expenses, and (in the case of stock insurers) to provide a profit margin. The unearned premium reserve, whether computed on a gross or net basis, is calculated on a pro rata basis, and no part of the unearned premium reserve is left at the termination of the premium payment period. The additional (mid-terminal) reserve remains in effect at that time, which is the reason for the "terminal" part of its designation, i.e., unlike the unearned premium reserve, it is still in effect at termination of the period for which the premium was paid. The term "mid-terminal" reflects the use of an average figure based upon the assumption that policies are sold at uniform intervals, so that all policies issued in any given calendar year may be deemed to have a mean, average, or "mid-terminal" date of July 1.

The reserve, in addition to net unearned premiums, arises from petitioner's long-term obligation stemming from the guaranteed renewable feature of the policies. This reserve is the measurement of petitioner's liability for future contingent claims—those not yet incurred under its individual policies—and is equal to the present value of future benefits payable under those policies minus the present value of future net level premiums receivable.

Under Missouri law and State insurance codes, generally, it is the professional task of the actuary to place a sound value on the company's policy liabilities. At all times here relevant,

petitioner employed E. Paul Barnhart, its consulting actuary, to value, or to supervise the valuing of, the active life reserves petitioner was required to carry for all of its individual GRHA policies in force.

A variety of computational methods are available to the actuary for use in calculating the reserve in addition to unearned premiums. The method selected in a particular case is subject to actuarial judgment guided by professional standards in light of the circumstances at hand, and to the minimum requirements of State law. The actuary may use any reasonable method that will place a sound value on the company's policy liabilities, and that will produce an amount satisfying the minimum requirements of State law.

Under the Missouri minimum valuation standard, as well as good actuarial practice, the mid-terminal reserve may be computed either on a net level basis or on a preliminary term basis. The preliminary term method or basis of computing reserves is a recognized and accepted actuarial method, and has been accepted by the National Association of Insurance Commissioners (hereafter NAIC) and by the pertinent regulatory agencies of those States in which petitioner does business. It is the method most commonly used for valuing reserves on individual accident and health policies with level premiums based on original age at issue. At all times here relevant, petitioner computed the mid-terminal reserves on its individual GRHA policies on a 2-year preliminary term basis, using appropriate valuation tables constructed by its actuary for this purpose and based on recognized mortality and morbidity tables and an assumed rate of interest at 3-percent compounded. Petitioner's actuary, E. Paul Barnhart, instructed company personnel in the proper use of such valuation tables to compute the mid-terminal reserve.

Mechanically, the computation of a 2-year preliminary term basis of the mid-terminal reserves with respect to petitioner's individual health and accident policies was, during the taxable years here in controversy, as follows:

(a) An outside statistical firm retained by petitioner for that purpose broke down the policies by calendar year of issue, treating all policies issued in a calendar year as being issued on July 1 of that year for these purposes.

(b) An amount was computed for each policy in force more than 2 years as of the valuation date by applying to each such policy the unit reserve factors (from the appropriate valuation table) which would have been applied had the net level basis of computation been used and had the policy been issued 2 years later than its actual issue date, at an issue age 2 years older than its actual issue age. If the amount so computed was positive, it was added to the mid-terminal reserves.

(c) If the amount computed as described in preceding clause (b) was zero or negative, zero was added to the mid-terminal reserves.

(d) Zero was added to the mid-terminal reserves for each policy in force 2 years or less as of the valuation date.

As an example of the foregoing computation, if an insured purchased a policy in 1971 at the age of 30, petitioner would have added zero with respect to such policy to the mid-terminal reserves computed as of December 31, 1971, and December 31, 1972. Commencing with the December 31, 1973, valuation date (assuming renewal), petitioner would have added to the mid-terminal reserves that amount (not less than zero) which would have been required on a net level reserve basis had the policy been issued in 1973 to the insured at the age of 32.

The preliminary term method of valuation recognizes that an insurer's administrative expenses in the first years of a policy are much higher than those in renewal years, and that conversely, claims costs will increase with age. Thus for 2 policy years or even longer, the insurer may have a substantial unliquidated initial expense before setting up reserves. For these reasons, the recommendations of the NAIC Task Force 4, and the NAIC Industry Advisory Committee on Reserves for Individual Health Insurance Policies, provide for a preliminary period of 2 years in the minimum reserve basis for individual accident and health policies.

While the reserve is mechanically developed by applying "unit" reserve factors to "unit" benefits of single policies, separate reserves are not held on single policies. Rather, the additional reserve is an aggregate reserve and has actuarial meaning only with respect to an entire group of policies. Mortality tables are used in the calculation of unit reserve values, and a mortality table assumes a large population of

policyholders who are expected to die or become ill according to certain yearly death rates. The additional reserves are an aggregate amount which, together with future net premiums, will meet the benefit payments arising from the group of policies valued as such benefits accrue in the future. The application of a formula for the calculation of such reserves to an individual policy (or small group of policies) does not produce a meaningful result, since few policyholders will experience average morbidity.

As required by Missouri law, petitioner prepared for each of the years 1973 through 1976, under oath, comprehensive financial information which it included on its annual statement (hereinafter referred to as the NAIC statement). For each of the years 1973 through 1976, petitioner filed the NAIC statement with the director of the Missouri insurance division.

The purpose of the NAIC statement, which is filed by insurance companies with the insurance regulatory agency of each State in which the company is doing an insurance business, as well as with the Federal income tax return, is to provide information on the solvency of the company and with respect to whether the company is conducting its affairs in accordance with State legal requirements.

The NAIC form filed by life and accident and health companies contains a part called exhibit 9, and entitled "Aggregate Reserve for Accident & Health Policies." Exhibit 9 of the NAIC statement is subdivided into section A (hereafter called exhibit 9A), the active life reserve section, and section B, the claim reserve section. The first line of exhibit 9A is entitled "unearned premium reserve." The second line is entitled "additional reserves."

The entry in line 1 of exhibit 9A of the NAIC statements of petitioner in each of the taxable years in controversy consisted solely of the gross pro rata unearned premium on all of its GRHA policies in force. The entry in line 2 in each such year consisted solely of the mid-terminal reserve computed on the 2-year preliminary term basis as previously described. During the years before the Court (1973–76), petitioner's active life insurance reserve included additional reserves attributable to the guaranteed renewable feature of its policies.

Petitioner's unearned premium reserves (line 1 of exhibit 9A) and additional reserves (line 2) on its individual accident

and health policies, as reported on its NAIC statements, amounted to the following at the dates shown below:

| Date | Unearned premium reserves[1] | Additional reserves |
|------|------|------|
| 12/31/73 | $977,064.89 | $32,567 |
| 12/31/74 | 1,197,047.00 | 56,742 |
| 12/31/75 | 1,521,578.00 | 92,877 |
| 12/31/76 | 2,089,056.00 | 118,686 |

[1] The distribution of unearned premiums by policies in effect under 2 years and over 2 years, is as follows:

| | Gross pro rata unearned premiums computed on— | |
|------|------|------|
| Valuation date | Policies in force 2 years or less | Policies in force more than 2 years |
| 12/31/73 | $815,912.82 | $161,212.07 |
| 12/31/74 | 939,802.58 | 257,173.65 |
| 12/31/75 | 1,208,063.84 | 313,514.16 |
| 12/31/76 | 1,707,736.80 | 381,319.20 |

Petitioner began issuing accident and health policies in 1968. The amounts shown on line 2 as additional reserves in each of the foregoing statements reflect the fact that in those years the bulk of petitioner's accident and health policies in force were composed of policies in force 2 years or less.

Petitioner had its annual convention statement for each of the years 1973 through 1976 signed and certified by E. Paul Barnhart as consulting actuary. Mr. Barnhart's qualifications fully satisfied those prescribed for a consulting actuary by the director of the Missouri insurance division. The amounts carried in petitioner's balance sheet on account of the unearned premium reserve, and the additional reserves for individual accident and health policies which contained the clause of guaranteed renewability, as shown in exhibit 9 of petitioner's NAIC statement for each of the years 1973 through 1976—

(a) were computed in accordance with commonly accepted actuarial standards consistently applied and were fairly stated in accordance with sound actuarial principles;

(b) were based on actuarial assumptions which were in accordance with, or stronger than, those called for in policy provisions;

(c) met the requirements of the insurance laws of Missouri;

(d) made good and sufficient provision for all unmatured obligations of petitioner guaranteed under the terms of its policies;

(e) were computed on the basis of assumptions consistent with those used in computing the corresponding items in the annual convention statement on the preceding yearend; and

(f) included provision for all actuarial reserves and related statement items which ought to be established.

Based on the advice of Mr. Barnhart, petitioner established a premium structure for its individual guaranteed renewable policies. The annual premiums charged for these policies were approximately 20 percent higher than the annual premiums petitioner would have charged for comparable policies provided on a cancelable basis. The excess premium charged (relative to identical cancelable coverage) was introduced into the pricing of petitioner's policies in order to cover the additional cost inherent in the insurer's obligation to renew the coverage in later years when the insured is older.

There are no differences in the terms and provisions of National States' GRHA policies, or in the company's obligations thereunder based upon how long the policies have been in force. Specifically, with respect to guaranteed renewability, National States is contractually bound to precisely the same extent under a GRHA policy that has been in force for 2 years or less, as it is under a GRHA policy that has been in force for a longer period.

National States' exposure to long-term morbidity risks under its GRHA policies in force for 2 years or less was not materially different from its exposure to long-term morbidity risks under its GRHA policies in force over 2 years. Both its policies of less than 2 years duration and its policies of over 2 years duration carried long-term morbidity risks, based on one and the same provision obligating the company to renew.

OPINION

We are called upon to determine whether petitioner is a life insurance company within the meaning of section 801. Section 801 provides the following definition of a life insurance company:

SEC. 801(a). LIFE INSURANCE COMPANY DEFINED.—For purposes of this subtitle, the term "life insurance company" means an insurance company

which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

> (1) its life insurance reserves (as defined in subsection (b)), plus
>
> (2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

Section 801(e) provides that "guaranteed renewable life, health, and accident insurance shall be treated in the same manner as noncancellable life, health, and accident insurance."

Accordingly, petitioner will qualify as a life insurance company if its life insurance reserves, plus unearned premiums and unpaid losses on its GRHA policies, exceed 50 percent of its total reserve (hereafter the reserve ratio test). The total reserves, as defined in section 801(c), include life insurance reserves, unearned premiums and unpaid losses not included in life insurance reserves, and all other reserves required by law. In the case of guaranteed renewable health and accident insurance policies, unearned premiums and unpaid losses are inserted in both the numerator and the denominator of this fraction—both above and below the line. If that is done in this case, it is conceded that petitioner easily qualifies as a life insurance company. Respondent contends that unearned premiums and unpaid losses are includable only in the denominator because petitioner's policies are not guaranteed renewable. Respondent concedes that petitioner's policies meet the industry definition of a GRHA policy, but argues they are not guaranteed renewable within the meaning of the Federal income tax regulations. The regulations provide:

*Guaranteed renewable life, health, and accident insurance policy.* The term "guaranteed renewable * * * policy" means a * * * contract * * * which is not cancellable by the company but under which the company reserves the right to adjust premium rates by classes * * * , and with respect to which a reserve in addition to the unearned premiums * * * must be carried to cover that obligation. * * * [Sec. 1.801–3(d), Income Tax Regs. See sec. 1.801–3(c), Income Tax Regs. (applying to noncancelable health and accident policies).]

The parties have diametrically opposed interpretations of this regulation. Petitioner contends that the regulation, taken from the relevant congressional committee reports (discussed

*infra*), identifies level premium contracts with long-term obligations that by their nature require a reserve for later years when benefit costs will exceed premium income. It is undisputed that petitioner's contracts meet this definition, and petitioner argues that that ends the matter. Petitioner contends that other provisions of the regulations make it abundantly clear that its interpretation is correct.

Petitioner emphasizes that the same long-term risks exist on all its contracts from date of issuance, whether they have been in effect less or more than 2 years. It points out that reserves are established on an aggregate basis for all its policies, and that the reserves on an individual policy basis have no actuarial meaning. The particular reserving methods adopted and the computational mechanics of that reserve, petitioner concludes, are tools the actuary uses to meet the reserve obligation arising from the nature of the contracts—they arise from, rather than define, the nature of the contract. Accordingly, petitioner asserts its contracts qualify.

Respondent argues that the regulation reflects the intent of Congress that reserves in addition to unearned premiums be computed for all noncancelable and GRHA policies. Respondent contends that unless a policy is reserved under a method that creates these additional reserves, the unearned premiums and unpaid losses attributable to that policy cannot be included in determining whether petitioner meets the reserve ratio test qualifying it for life insurance company status. Respondent recognizes that the long-term risk inherent in petitioner's policies requires reserves. But he points out that policies in effect for less than 2 years neither enter into the computation of, nor contribute to, the additional reserves. Accordingly, he concludes premium reserves on policies in force less than 2 years go into the denominator but not the numerator of the qualifying fraction. Therefore, petitioner is not a life insurance company. We agree with petitioner on this close issue of first impression.[2]

---

[2]Both parties agree that the question before us has not been the subject of prior litigation. *Group Life & Health Insurance Co. v. United States*, 434 F.2d 115 (5th Cir. 1970), declaring sec. 1.801–3(d), Income Tax Regs., valid, dealt with a step-rate premium permitting adjustments in response to an increase in the actuarial risk. 434 F.2d at 119. *Group life* established neither the existence of, nor the need for, reserves on the type of policy involved,

Since the Code directs that GRHA policies be treated in the same manner as noncancelable health policies, we begin with the legislative history of the 1942 Revenue Act. This act expanded the definition of a life insurance company to include companies issuing noncancelable contracts of health and accident insurance. The rationale for this expansion is found in the committee reports:

Technical changes are made to distinguish in a clearer manner the *types* of insurance contracts included and to emphasize the fact that the unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are included for purposes of the definition of a life insurance company only. Since noncancelable contracts of health and accident insurance *require the accumulation of substantial reserves against increased future risks,* the writing of such insurance *is analogous to life insurance* and the definition has been changed to permit such companies to be taxed as life insurance companies. The unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are added to such reserves in determining whether a company is to be considered a life insurance company. The life insurance reserves defined in subsection (c)(2) as they pertain to noncancelable health and accident insurance policies are those amounts which must be reserved, in addition to unearned premiums, to provide for the additional cost of carrying such policies in later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums then being received. *As the term is used in the industry,* a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation. * * * [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 611–612. Emphasis added.][3]

Congress included noncancelable contracts of health and accident insurance because they "require the accumulation of substantial reserves against future risks" and therefore the writing of such insurance is "analogous to life insurance." Petitioner's policies require "the accumulation of substantial

and the Government's actuary testified additional reserves were not required. 434 F.2d at 120.

[3]When Congress required GRHA policies to be treated the same as noncancelable health policies, it again referred to the "type of insurance contracts" it had in mind.

"*The type* of insurance contracts referred to are life, health, and accident policies which are not cancelable by the company but under which the insurance company reserves the right to adjust premium rates by classes, in accordance with experience under the type of policy involved. [S. Rept. 291, 86th Cong., 2d Sess. (1959), 1959–2 C.B. 770, 793. (Emphasis added.) See also H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 748.]"

reserves against future risks," and these risks commence on the date the policy is issued. Both of these characteristics make petitioner's policies "analogous to life insurance" in the specific sense Congress used those words.

Respondent recognizes the long-term risks involved, but argues that the preliminary term method is defective because reserves are not actually computed under this method during the first 2 years. However, this hardly creates a marked difference from life insurance contracts. The preliminary term method had its origin in, and is used extensively in, the life insurance field, and the use of the preliminary term method is clearly compatible with a policy's status as life insurance. Congress identified the long-term risks necessitating reserves as the characteristic that is "analogous to life insurance," and the preliminary term method has long been extensively used in reserving life insurance policies against those long-term risks. Since this method has been used without any adverse tax consequences to the life insurance status of those policies, the disparity respondent introduces here is at war with the legislative history. Indeed, the analogy to life insurance is enhanced, not diminished by the use of the preliminary term method. In identifying the "types of insurance" it intended to include as "analogous to life insurance," Congress focused not on a particular reserving mechanism, but on the necessity for reserves arising from long-term risks.

In actuarial theory and practice, and as a matter of State regulation, it is the nature of an insurance contract that defines the reserve requirement. There are no differences in the terms of petitioner's GRHA policies, or in the company's obligations thereunder, based on how long the policies have been in force. Petitioner is contractually bound to the same terms and exposed to the same risks under a GRHA policy that has been in force for 2 years or less as it is under a GRHA policy that has been in force for a longer period.

Again, petitioner's exposure to long-term morbidity risks under its GRHA policies in force for 2 years or less was not materially different from its exposure to long-term morbidity risks under GRHA policies in force for more than 2 years. All

of these policies carried long-term morbidity risks, based on the same provisions obligating the company to renew.[4]

Accordingly, it is difficult to see how respondent's 2-year distinction is relevant in determining whether in the words of Congress, these policies are "analogous to life insurance," in exposing the company to long-term risks necessitating reserves. We are not aware that respondent makes any distinction in the analogous area of life insurance on the basis of policies that are reserved on the preliminary term method. It is hardly treating noncancelable and guaranteed renewable health and accident insurance policies in an analogous way to introduce a distinction solely in this area.

Additionally, Congress focused on, and adopted, the definition of a noncancelable insurance policy "as the term is used in the industry." Indeed, Congress specifically stated that *"As the term is used in the industry,* a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation." S. Rept. 1631, *supra,* 1942-2 C.B. at 612 (emphasis added). See also H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 372, 454 (using virtually identical language). This definition, which is the same today as when Congress adopted it, applies to GRHA policies with modifications not relevant to the present controversy. We think this is significant (cf. *Alinco Life Insurance Co. v. United States,* 178 Ct. Cl. 813, 373 F.2d 336, 353 (1967)), for the parties have stipulated, and we have found, that all of petitioner's GRHA policies satisfy the industry definition.

The language of the disputed regulation is taken almost verbatim from the 1942 committee reports set out above. It is difficult to see how respondent can stipulate that petitioner's policies meet the industry definition of a guaranteed renewable contract and at the same time contend that the language of the committee report (as incorporated in the regulations) precludes petitioner from qualifying. We believe the language

---

[4]Petitioner on brief offers the following example. Assume petitioner sells B a GRHA policy at age 50. His twin brother purchases an identical policy 2 years later, when they are both 52. Although the obligations and risks are identical, respondent claims one is guaranteed renewable, the other is not. We agree with the petitioner that this is a thin distinction.

of the committee report makes it clear that Congress intended to identify a product "type," and employed the term "noncancelable" (and guaranteed renewable) "as that term is used in the industry." The regulation, lifted virtually verbatim from the committee reports, must be interpreted accordingly.

The parties analyzed various arcane aspects of actuarial theories at some length. Petitioner argues that in accordance with the specific requirements of the actuarial authorities and State law, the additional reserves from its GRHA policies are aggregate reserves applicable to *all* its GRHA policies on which it incurs the same risk from the date of issue. Petitioner emphasizes that insurance is spreading the risk through averages incorporated in mortality and morbidity tables. While unit reserves are applied to individual policies, petitioner continues, it makes no sense to view reserves as applicable to one policy (or a small number of policies), since one policyholder either lives or dies, or gets sick or remains well during the year, but does not experience averages. Respondent, as he must, concedes most of this, but says it begs the question, the question being to what group the aggregates apply. He contends the aggregates are applicable to the groups of policies on which they are computed and from which they are derived—those in effect 2 years and longer.

Petitioner has the better of this argument. Both in actuarial theory and as a matter of law, the reserves computed on the preliminary term basis are applicable to *all* of petitioner's policies—whether in effect more or less than 2 years. The reserves are aggregates and are applicable to all petitioner's policies in precisely the same way as reserves computed on a net level premium basis—there is simply no difference in the scope of this application. It is true that under the mechanics of computing the mid-terminal reserve on the preliminary term basis, a zero amount is added to the reserve for the policies that have not yet passed their second anniversary, while larger amounts are added for policies beyond their second anniversary date. But the method of derivation cannot obscure the fact that, both in legal and actuarial theory, the amount derived under both the preliminary term and net level premium bases is an aggregate reserve equally applicable in both instances to policies under and over 2 years of age.

The basic difference between the net level method and the preliminary term method is the amount of front-end expense allowance and the additional net premium subsequently necessary to fund this expense allowance. If petitioner's GRHA policies are viewed as 2-year term policies (for which no reserves are set up) followed by a permanent policy issued to an insured 2 years older and for a premium payment period 2 years shorter, the net premiums after the first 2 years must be larger. See D. Gregg & V. Lucas, Life and Health Insurance Handbook 165 (3d ed. 1973). The increase in the net premium (with a consequent reduction of the loading element in the level gross premium) will be equal to the annual sum necessary to amortize the first 2-year reserve not established under the preliminary term method. Gradually, the reserves grade to net level over the premium paying period of the policy. Put differently, the amount ultimately accumulated will be the same under either method.

In summary, on the record before us, the two reserving methods are, over time and from the viewpoint of actuarial soundness, tweedledum and tweedledee. Neither changes the nature of the insurance policies it addresses, but responds to the identical characteristics of those policies necessitating reserves—long-term risks. With this in mind, it is idle theoretical discourse to speculate about companies whose entire inventories of policies are over 2 years or under 2 years. Congress has legislated through the years not with theoretical constructs in mind, but for companies participating in a dynamic industry year after year. As a new company, a greater proportion of petitioner's policies were less than 2 years old, but many of its policies were more than 2 years old. As in any dynamic business, this distribution would change from year to year and generally the portion attributable to policies in force 2 years or more will increase the longer a company is in business. However, a sharp increase in business for 2 years could subsequently alter the proportion again in favor of policies under 2 years in age.

Under respondent's interpretation, an admittedly qualified insurance company that branches into noncancelable health policies reserved on the preliminary term basis could lose its life insurance status. In 3 years or so, as their policies age, they could requalify. If they had a sharp increase in sales a couple

of years later, they would be disqualified again, only to re-requalify later. We doubt that Congress intended any such distinction between the preliminary term and net level reserving methods, particularly since it has encouraged the use of the preliminary term method. See sec. 818(c) and discussion *infra*.

Possibly it was with these thoughts in mind that respondent promulgated section 1.801–3(b)(2) of the regulations, which plainly resolves any remaining doubts in petitioner's favor. That regulation provides:

> An insurance company writing only noncancellable life, health, or accident policies and having no "life insurance reserves" may qualify as a life insurance company if its unearned premiums, and unpaid losses (whether or not ascertained), on such policies comprise more than 50 percent of its total reserves.

This language unequivocally states that a company issuing only noncancelable health policies may qualify under the reserve ratio test on the basis of its unearned premiums and unpaid losses alone.[5] Although policies reserved under the preliminary term method produce zero life insurance reserves during the first 2 years, the language of this regulation plainly permits this.

Additionally, if we interpret the earlier regulation (section 1.801–3(d), Income Tax Regs., defining guaranteed renewable policies) as referring to policies that by their nature require reserves to reflect long-term risks, both regulations are entirely consistent. On the other hand, respondent's reading of the regulation defining guaranteed renewable policies requires reserves for each policy in every year and makes those two regulations difficult to reconcile. Indeed, if respondent's position is correct, the situation contemplated in the above regulation could hardly arise because the company would have to have "life insurance reserves" (i.e., additional reserves, see sec. 1.801–4(d)(3), Income Tax Regs.) in order for its policy to qualify as "guaranteed renewable" in the first place. Accordingly, we conclude that although policies reserved under the preliminary term method produce zero life insurance reserves

---

[5] Guaranteed renewable policies are treated in the same manner as noncancelable policies, which are defined in sec. 1.801–3(c), Income Tax Regs. See sec. 801(e).

during the first 2 years, the regulations clearly permit this as consistent with life insurance status.[6]

We also believe respondent's position is incompatible with the congressional purpose underlying section 818(c). Without belaboring the complications, higher reserves reduce both the phase I and phase II tax computations. Solely for tax computation purposes, Congress in section 818(c) permits companies under the preliminary term method to constructively recompute their reserves on a net level method in order to equalize the computation of the reserves-earnings deductions. The legislative history explains:

> Most life insurance companies compute their reserve funds on the basis of a level net premium. A number of life insurance companies, however, especially smaller companies in the early stages of operation, compute their reserve funds by some form of preliminary term method, such as full preliminary term, modified preliminary term (Illinois standard) or select and ultimate. These reserve standards require lower reserves in the earlier years of a policy than does the more usual level net premium method. In order to equalize the computation of the reserve earnings deduction, an additional amount equal to 7 per cent of the life insurance reserves computed on a preliminary term basis is to be added in computing the adjusted reserves. [H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 372, 454. See S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 612; see also S. Rept. 291, 86th Cong., 2d Sess. (1959), 1959–2 C.B. 770, 792.]

Congress wanted to assist new and smaller companies using the preliminary term method. But if respondent is correct, this attempt at equalization is futile, since small new companies issuing principally noncancelable or guaranteed renewable

---

[6]Petitioner emphasizes that respondent, until recently, agreed with its interpretation of sec. 1.801–3(d), Income Tax Regs. The parties have stipulated a 1964 Technical Advice Memorandum wherein respondent stated:

"To interpret section 1.801–3(d) of the Regulations as requiring an additional reserve in order that a particular policy may qualify as a guaranteed renewable life, health, and accident contract would obviously be inconsistent with section 801(e) and section 1.801–3(b)(2) which indicate clearly that policies may be 'noncancellable' even though no 'life insurance reserves' are held with respect thereto. Accordingly, it is concluded that the words 'with respect to which a reserve in addition to unearned premiums * * * must be carried * * *' are only intended as a general description of the long-term, increasing risks usually covered in noncancellable or guaranteed renewable health and accident policies, which over the life of the contracts require a reserve in addition to gross unearned premiums. It should not be construed as a specific requirement that such a reserve must actually be held in the earlier years of the policy term."

Petitioner notes its earlier years were closed by an agent consistent with this interpretation, and that they have now been unfairly caught in midstream by an impermissible retroactive change. In view of our decision, we need not rule on this matter.

policies reserved on the preliminary term method would be unable to qualify as life insurance companies for several years. We are unwilling to assume an interpretation that, in addition to many other difficulties, undermines section 818(c).

When contracts are reserved on the preliminary term method, respondent would apply the benefits of section 818(c) to those contracts after 2 years, when at that time they become noncancelable or GRHA contracts in accordance with his interpretation of the regulations. But applying section 818(c) at this point would be perverse, since reserves accumulated under a guaranteed renewable policy after the second year are higher on a preliminary term basis than they would be on a net level basis.

The parties have added embellishments to the arguments previously discussed, and we have carefully reviewed them. They do not warrant adding to the length and complexity of this opinion.[7] Suffice it to say that the preliminary term method, developed for new and smaller companies by State insurance officials, is the most common method in use for GRHA policies. We are convinced the profound distinctions respondent proposes to introduce between this method and the net level method are warranted by neither the statute nor the underlying congressional intent.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

KÖRNER, *Judge*, dissenting: I respectfully dissent. The issue presented for our decision in this case is whether petitioner's accident and health policies which were in force 2 years or less, and with respect to which petitioner valued mid-terminal reserves on the 2-year preliminary term basis, qualified as "noncancellable" or "guaranteed renewable" accident and health policies for Federal tax purposes.

In resolving this issue, we are not provided with statutory guidance since the Internal Revenue Code nowhere defines the

---

[7]The major argument we have avoided concerns whether some portions of petitioner's unearned premium reserves are "additional reserves."

terms "noncancellable" or "guaranteed renewable" accident and health policies. Sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., do define these terms, however, and we are thus called upon to interpret these regulations.

The specific terms of sections 1.801–3(c) and 1.801-3(d), Income Tax Regs., provide, inter alia, that, in order for a policy of accident and health insurance to be classified as "noncancellable" or "guaranteed renewable" for Federal tax purposes, it must be one which the issuing company is under an obligation to renew at a specified premium (in the case of noncancelable policies) or at a premium rate which can be adjusted by class according to experience (in the case of guaranteed renewable) *and* with respect to which a reserve in addition to unearned premiums must be carried to cover the obligation to renew. Thus, under the regulations, an insurance company must assume a long-term risk *and* be required to carry a reserve to cover that risk with respect to each policy which it seeks to classify as noncancelable or guaranteed renewable for Federal tax purposes.

There is no question that the policies under consideration are policies which the issuing company is under an obligation to renew at a specified premium or at a premium that can be adjusted only by class according to experience, and respondent does not contend otherwise. The focus of our inquiry is whether the "reserve" requirement imposed by the regulations is satisfied during the first 2 years of the policies' existence under the 2-year preliminary term method of reserving as employed by petitioner. That is, can petitioner's accident and health policies 2 years or less in force legitimately be considered to be policies "with respect to which a reserve in addition to unearned premiums must be carried" to cover petitioner's obligation to renew?

The majority answers the above question in the affirmative. In reaching this conclusion, the majority appears to rely upon two separate theories. First and primarily, it seems to feel that the sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., were meant to generally define those accident and health insurance policies which are long-term policies for which the issuing company may be required to establish reserves *at some time*. Under this interpretation, whether petitioner was required to actually establish reserves with respect to its policies during

their first 2 years of existence thus becomes irrelevant since the policies in issue are clearly long-term policies which, by their nature, may require petitioner to begin to accumulate reserves *at some future time*. Second, the majority appears to have accepted petitioner's argument that the reserves which petitioner has actually established during the years in issue are to be considered to be maintained "with respect to" accident and health policies in force 2 years or less within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., even though such policies in no way contribute computationally to such reserves. Under this reasoning, the "additional reserve" requirement of the regulations is, according to the majority, satisfied with respect to all of petitioner's renewable accident and health policies from the date of issuance.

I do not think that either of the above two theories represents an adequate basis for the majority's resolution of the issue presented in this case. In my opinion, the definitional regulations may only legitimately be read to require a "reserve in addition to unearned premiums" to be actually carried (i.e., computed and set aside) with respect to each policy, for each and every year the taxpayer seeks to classify a particular policy as noncancelable or guaranteed renewable for Federal tax purposes. It is my further belief that petitioner's accident and health policies in force 2 years or less failed to meet these definitional standards under the 2-year preliminary term method employed by petitioner. The reasons for my respective conclusions are set out in the following subsections.

## I. The Requirement of an Additional Reserve— *Its Genesis and Rationale*

A company which qualifies as a "life insurance company" under section 801(a)[1] receives a preferred Federal tax status relative to that of other insurance companies and corporations. The question presented in the present case—i.e., whether petitioner's accident and health policies 2 years or less in force qualified as noncancelable or guaranteed renewable

---

[1] All section references herein are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise expressly indicated.

policies for Federal tax purposes—is important only because its resolution will determine whether petitioner was qualified to receive the preferred tax status afforded to "life insurance companies." The proper interpretation of the regulations that define "noncancellable" and "guaranteed renewable" accident and health policies must therefore be made in light of considerations that prompted Congress to afford favorable Federal tax treatment to "life insurance companies." Otherwise we risk employing an interpretation which would cause the regulations to fail to harmonize with the premise that underlies the statute they purport to interpret. Such a reading must clearly be avoided. See, e.g., *Maximov v. United States*, 373 U.S. 49 (1963); *Burnet v. Guggenheim*, 288 U.S. 280 (1933).

The unique system of Federal income taxation of life insurance companies had its genesis in the Revenue Act of 1921[2] (hereinafter the 1921 Act). Prior to 1921, life insurance companies had been taxed under a system comparable to other corporations in that all of the income of such companies, including income derived from investments, as well as premium receipts, was subject to tax.[3] However, due to the peculiar nature of the life insurance business, fundamental inequities were perceived to flow from the application of general corporate taxation rules to life insurance companies.[4] In particular, it was pointed out to Congress that the application of standard tax accounting conventions which, in end result, offset current expenses against current receipts and thereby arrive at the "taxable income" of a business for a particular year, could prove to be an inadequate measure of the annual income of companies issuing long-term life insurance policies. This is because companies issuing such policies assume long-term actuarial risk *and* are required by State law to set aside current receipts or other assets in reserves to cover those risks. When a company is required to set aside current receipts in reserve to pay future claims under a policy, such receipts are not currently available for general corporate purposes, or for

---

[2]Ch. 136, secs. 242–247, 42 Stat. 227, 261–264 (1921).

[3]A special deduction was allowed for certain additions to net reserve funds. See generally 1 T. Nash, Federal Income Taxation of Life Insurance Companies, sec. 5 (1982).

[4]See, e.g., Testimony of T. S. Adams, Senate Hearings on H.R. 8245, 67th Cong., 1st Sess. 83 (1921).

distribution to shareholders. As such, amounts required to be reserved by a life insurance company are, in the words of the Supreme Court "not true income, but * * * analogous to permanent capital investment." (Fn. ref. omitted.) *Helvering v. Oregon Mutual Life Insurance Co.*, 311 U.S. 267, 269 (1940). See also *National Life Insurance Co. v. United States*, 277 U.S. 508 (1928); *Economy Finance Corp. v. United States*, 501 F.2d 466, 481 (7th Cir. 1974), cert. denied 420 U.S. 947 (1975); *Group Life & Health Insurance Co. v. United States*, 434 F.2d 115, 117 (5th Cir. 1970), cert. denied 402 U.S. 944 (1971); *Alinco Life Insurance Co. v. United States*, 178 Ct. Cl. 813, 373 F.2d 336 (1967).

This characterization of the life insurance business led Congress to conclude that "life insurance companies" should be taxed differently from other corporations. In enacting corrective measures, however, Congress did not choose to adopt statutory provisions which ferret out each portion of an insurance company's gross receipts which were not the proper subject for current taxation. Instead, extremely broad standards were adopted. Under the 1921 Act, "life insurance companies" were allowed to exclude 100 percent of annual premium receipts from gross income.[5] Significantly, however, those companies which were to be afforded this preferential tax status were defined by reference to the qualitative nature of their reserves. Thus, only a "life insurance company" was to be afforded the above-noted beneficial tax treatment and such a company was defined in the 1921 Act as:

an insurance company engaged in the business of issuing life insurance and annuity contracts * * * the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.[6]

The expressed goal of the above reserve ratio test was to distinguish between those companies whose predominate business for *any given year* was the issuance of "life insurance"

---

[5]See sec. 244(a) of the 1921 Act. This approach to the taxation of "life insurance companies" was modified by the Life Insurance Income Tax Act of 1959. See Pub. L. 86–69, 73 Stat. 112 (applicable retroactively to taxable years beginning after Dec. 31, 1957). Under the 1959 Act, "life insurance companies" are effectively entitled to exclude only one-half of their underwriting income from current taxation. See secs. 802(b)(3), 815(d)(2).

[6]See sec. 242 of the 1921 Act. 42 Stat. 227, 261.

from those companies whose predominate business for any given year was the issuance of accident and health insurance. As explained by T. S. Adams, then tax adviser to the Treasury, the rationale underlying the 50-percent life insurance qualification formula was as follows:

> Some companies mix with their life business accident and health insurance. It is not practicable for all companies to disassociate those businesses so that we have assumed that if the accident and health business was more than 50 percent of their business, as measured by their reserves, it could not be treated as a life insurance company. On the other hand, if their accident and health insurance were incidental and represented less than 50 percent of their business we treated them as life insurance companies. [7]

The distinction between predominately life companies and predominately accident and health companies was necessary under the statutory scheme because in 1921, accident and health policies were essentially short-term policies, and current premium receipts were therefore treated as entirely earned by the issuing company at the end of the current periodic premium-paying period. As such, premiums received with respect to such policies were not required to be segregated into long-term reserves, and companies whose predominate business, as measured by their reserves, consisted of the issuance of such policies should not, in Congress' view, be entitled to exclude annual premium receipts from current taxable income. That is, the "true income" of such a company could be adequately measured annually by invoking standard tax accounting conventions, since no long-term reserve requirement accompanied such policies.

As the insurance industry evolved after 1921, the accident and health business sold by life-type companies began to vary and expand considerably.[8] Such companies began writing accident and health policies which were renewable at the option of the insured at a level, unadjustable premium rate over a long period of time. Later, such companies developed an analogous long-term accident and health policy whose premium rate could be adjusted by class in accordance with the

---

[7]Hearings on H. R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 85 (1921).

[8]See G. Lenrow, R. Milo & A. Rua, Federal Income Taxation of Life Insurance Companies, ch. 9 (3d ed. 1979).

issuing company's experience under the policy, but could not be adjusted due to the increased age and underwriting status of the insured. Since both of these types of long-term accident and health policies impose actuarial risks upon the issuing company which will not be sufficiently offset by premium receipts in the later years of the policies, Congress perceived that a certain percentage of current premiums received with respect to such policies would be required to be segregated into long-term reserves to cover such risks. When the predominate business of a company *for any given year* was of a nature which required the company to treat a significant percentage of current premium receipts as unearned (i.e., to establish long-term reserves with respect thereto), Congress concluded that such companies should be afforded the same preferential tax treatment as "life insurance companies."

When Congress expanded the definition of a "life insurance company" in 1942 and 1959[9] to include those companies predominately issuing "noncancellable" and "guaranteed renewable" accident and health policies, respectively, the need to establish long-term reserves against increased future risks with respect to such policies was thus explicitly recognized as justifying the expansion. In fact, the legislative history indicates that Congress considered the *sole* reason those policies should be treated as "life insurance policies" for purposes of the reserve ratio test of section 801 was because a long-term reserve was perceived as required with respect to such policies. Thus, in its report on the 1942 Act, the Senate Finance Committee stated:[10]

*Since* noncancelable contracts of health and accident insurance *require the accumulation of substantial reserves against increased future risks*, the writing of such insurance is *analogous to life insurance* and the definition has been changed to permit such companies to be taxed as life insurance companies. * * * As the term is used in the industry, a noncancellable insurance policy means a contract which the insurance company is under an obligation to renew *at a specified premium and with respect to which a reserve in addition to unearned premiums must be carried to cover the renewal obligation.* [Emphasis supplied.]

[9]See ch. 619, 56 Stat. 798 (1942); sec. 201(b), sec. 801(e), I.R.C. 1954.
[10]S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 611-612. See also S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 770, 793.

In light of the above-outlined history of taxation of life insurance companies and, in particular, the Senate Report quoted immediately above, I find that I must take issue with the majority's primary conclusion that, for purposes of resolving the issue before us, the reserves "arise from rather than define the nature of the contract." Quite to the contrary, it is apparent that the sole reason Congress considered itself justified in expanding the definition of a "life insurance company" to include companies predominately issuing non-cancelable and guaranteed renewable accident and health policies was because such policies "require the accumulation of substantial reserves." For purposes of determining the *Federal tax classification* of such a policy, therefore, the reserve does in fact define the contract. The mere fact that a policy of accident and health insurance is a long-term policy was not intended to be the determining factor in classifying the policy for Federal tax purposes.

Sections 1.801–3(c) and 1.801–3(d) of the regulations recognize this fundamental fact. Under these regulations, a policy of accident and health insurance will only qualify as noncancelable or guaranteed renewable for Federal tax purposes if it is one which the issuing company is under an obligation to renew for a specified period and with respect to which a reserve in addition to unearned premiums *must be carried* to cover *that obligation to renew*. Moreover, since the Federal tax classification of an insurance company must be made on an *annual* basis, it seems fundamental to me that the specific definitional requirements of policies which are to contribute to a company's classification as a "life insurance company" must also be satisfied for each and every year the preferred classification is sought. Although a policy may be a level premium policy which the company is under an obligation to renew, unless the company is required to *currently* establish long-term reserves to cover *its obligation to renew*, the policy is simply not the type of policy which Congress intended to contribute to a company's *current* classification as a "life insurance company."

Any other reading of these regulations, in my opinion, would not be in keeping with the premise underlying the expansion of the definition of a "life insurance company" to include those

companies issuing predominately "noncancellable" or "guaranteed renewable" accident and health policies.

The long-term liability to renew under a level premium accident and health policy may exist from the date the policy is first issued. However, such a liability can in no way be considered an "accrued" liability, since the time and amount of ultimate payment under the policy depends upon *future* events. The reserve quantifies this otherwise unquantifiable obligation through implementation of actuarial theory and requires the segregation of assets which would otherwise remain available for general corporate use. Until the company takes that reserving step with respect to premiums received on a particular policy, the above-cited legislative history indicates that the policy is not the type of policy that was intended to contribute positively to a company's "life insurance company" status.

I would therefore read sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., to require a long-term reserve to be actually established (i.e., computed and set aside) to cover the company's obligation to renew a policy before that policy is to be classified as noncancelable or guaranteed renewable for Federal tax purposes. Cf. *Economy Finance Corp. v. United States, supra* at 482, where the Seventh Circuit Court of Appeals cited with approval a Revenue Ruling (Rev. Rul. 71–367, 1971–2 C.B. 258), which adopts this interpretation.

## II. *Do Petitioner's Policies Qualify?*

### A. OPERATION OF THE 2-YEAR PRELIMINARY TERM METHOD

I would thus read sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., to require that a long-term reserve be currently maintained with respect to a policy of accident and health insurance before that policy will be classified as noncancelable or guaranteed renewable for Federal tax purposes. Were these definitional requisites met by petitioner's policies 2 years or less in force under the 2-year preliminary term method of reserving employed by petitioner? A close examination of the operation of the 2-year preliminary term method leads me to conclude that the answer to this question must be in the negative.

As already stated, the policies in dispute in this case were clearly long-term policies which were renewable at the option of the insured at a level premium. Thus, in establishing the premium rate to be charged for its renewable policies, it was necessary that petitioner include both the actuarial cost of insuring the policyholder for the current periodic premium term as well as the cost of the long-term risks, actuarially computed, represented by petitioner's promise to renew the policy at a level premium. This latter amount (i.e., the amount petitioner charged which was allocable to its obligation to renew) is quite clearly that amount which Congress contemplated to be required to be set aside as a "reserve in addition to unearned premiums" before a policy would be classified as noncancellable or guaranteed renewable for Federal tax purposes. As the relevant Senate report states, "reserves in addition to unearned premiums" are—

those amounts which must be reserved * * * to provide for the additional cost of carrying [noncancelable policies] in later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums being received.[11]

The amount which is required to cover petitioner's "obligation to renew" a particular level premium policy as that term is used in sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., is thus an actuarially quantifiable dollar amount which can be computed on each periodic premium payment made with respect to each policy in force. Such amount (i.e., the amount representing petitioner's obligation to renew), actuarially computed, equals the amount by which the present value of future benefits to be paid under a particular policy exceeds the present value of future net valuation premiums (i.e., generally all future premiums to be received by the company) under that policy.

However, under the 2-year preliminary term method of computing mid-terminal reserves, the fact that petitioner included in its gross premium charge an amount intended to cover its obligation to renew which it admittedly incurred under its level premium policies was completely ignored for purposes of reserving. In fact, for purposes of reserving,

---

[11]S. Rept. 1631, *supra*, 1942–2 C.B. at 612.

policies less than 3 years old are treated as though they were nonrenewable, short-term policies under the 2-year preliminary term method. Thus, with respect to policies 2 years or less in force, petitioner was required to establish only short-term (unearned premium and unpaid loss) reserves and no provision was made to cover petitioner's obligation to renew. (For further discussion of this point, see *infra.*)

This point is made clear by the mechanics an insurance company employs in computing mid-terminal reserves under the 2-year preliminary term method. Under this method, the dollar amount of that terminal reserve is the excess of the present value of future benefits over the present value of future net valuation premiums on each renewable policy which has been in force for *more than the preliminary term* at the statement date, *but does not include any amount representing the excess of the present value of future benefits over the present value of future net valuation premiums on those renewable policies which have been in force for a period equal to or shorter than the preliminary term being used.*[12]

Thus, although it is clear that petitioner incurred an obligation to renew, and that that obligation to renew could be represented by an actuarially quantifiable dollar amount, it is also clear that, under the 2-year preliminary term method of reserving employed by petitioner, that amount representing its obligation to renew was not required to be placed into a terminal reserve *until and unless* the policy entered its third year. Premiums received with respect to all of petitioner's renewable policies in force 2 years or less were treated as totally earned at the end of each year, and were therefore subject to unrestricted corporate use. In my opinion, there is simply no legitimate way that these policies 2 years or less in force can be said to be policies with respect to which a reserve in addition to unearned premiums must be carried to cover petitioner's obligation to renew within the meaning of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Although the obligation to renew may exist during the policies' first 2 years,

---

[12]See Report of the Advisory Committee to the National Association of Insurance Commissioners, 1964; J. Magee, Life Insurance 564 (3d. ed. 1958); J. MacLean, Life Insurance 134–140 (8th ed. 1956).

this obligation was not acknowledged and quantified by a reserve as these regulations specifically require.

The majority, in reaching the opposite result, appears to have been influenced by the testimony of the petitioner's experts that the 2-year preliminary term method is an actuarially sound method of computing reserves. Thus, the majority states that the net level method and the preliminary term methods of reserving are, *from the viewpoint of actuarial soundness*, "tweedledum and tweedledee." From this the majority concludes that since the policies reserved under the net level method would satisfy the definitional requisites of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., then policies reserved under the 2-year preliminary term method should also.

We are, however, not called upon in this case to determine the relative actuarial soundness of the preliminary term method of reserving vis-a-vis the net level method. Considerations which give rise to an actuary's conclusion that a particular method of reserving is "sound" in any given context are, in my view, quite irrelevant for purposes of the issue we have before us in this case. Of primary concern to actuarial theory is the solvency of a company over time. As noted above, the Internal Revenue Code provisions here involved are ultimately concerned with the proper Federal tax classification of an insurance company.

Moreover, although no one will dispute that under the 2-year preliminary term method of reserving the amount accumulated in a reserve for a particular policy will ultimately be the same as under the net level method *if* the policy remains in force for the *entire policy term*, this fact should not be determinative. The salient fact here is that under the net level method, long-term reserves are required to be accumulated beginning with the first policy year, while under the 2-year preliminary term method, *no* long-term reserves are required to be established until and *unless* the policy enters its third year.

Policies reserved under the net level method thus meet the specific requirements of the sections 1.801–3(c) and 1.801–3(d),

Income Tax Regs., in their first year, their second year, and every subsequent year the policy is in force.[13] A certain percentage of each annual premium received with respect to such policies will therefore not be useable by the issuing company in the year received, and such policies should contribute positively to the issuing company's life insurance status, under the statutory scheme.

With respect to policies reserved on the 2-year preliminary term basis, however, the situation is quite different. No portion of the premiums received with respect to such policies will be required to be set aside in long-term reserves on either of the first 2 years of the policies' existence; nor will any contribution to the reserve with respect to those policies be made from any other source.[14] One hundred percent of such premiums will therefore be totally available to the issuing company for general corporate purposes and the specific requirement of an additional reserve contained in sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., will not be satisfied *during those 2 years.* If the policy is canceled before it enters its third year, no additional reserve will have *ever* been

---

[13] The operation of the net level method of reserving in contrast to the 2-year preliminary term method is made apparent by the following example. As noted *supra,* under the 2-year preliminary term method, the dollar amount of the terminal reserve is computed by taking the excess of the present value of future benefits to be paid over the present value of future net valuation premiums on each policy that has been in force for *more than 2* years at the annual statement date, but does *not* include the amount representing the present value of future benefits over the present value of future net valuation premiums on policies in force less than 3 years. Under the net level method on the other hand, the dollar amount of the terminal reserve consists of the excess of the present value of future benefits over the present value of future net valuation premiums on *each policy, regardless of the length of time the policy has been in force.*

[14] Although policies reserved under the 2-year preliminary term method will contribute to the terminal reserve at an accelerated rate vis-a-vis the net level method *if* such policies remain in force for more than 2 years, it is clear that the purpose of this accelerated contribution is to allow *that particular policy* to "catch up" for prior years when no amounts were contributed to offset risks which attached *to that policy.* These accelerated amounts therefore cannot be considered to be maintained "with respect to" policies still within the 2-year preliminary term. An example may aid in understanding this point. If petitioner issued a renewable accident and health insurance policy to an insured at age 30, the mid-terminal reserve would not include any amount attributable to such policy for the first 2 policy years under the 2-year preliminary term method. Only in the third policy year would the total mid-terminal reserve be affected by such policy, when an amount would then be added to or included in that total reserve. This amount would be based upon the excess of the present value of the future benefits over the present value of future net valuation premiums on such policy, computed as though the policy were then newly issued to an insured at age 32, and the additional reserve were being computed under the net level method.

required or maintained with respect to that policy and the specific definitional requirement of the regulations will therefore *never* have been satisfied.

This fundamental fact cannot be ignored. Accident and health insurance has, as a general rule, a relatively high early cancellation rate. In fact, petitioner's expert testified that something in excess of 50 percent of its renewable policies could be predicted to be canceled by the insureds before they enter their third year. This fact is, of course, considered by the actuary in determining whether a preliminary term method is "actuarially sound" since there is no actuarial reason for establishing long-term reserves with respect to policies which can be predicted to be essentially short term.

Thus, although the 2-year preliminary term method of reserving may be actuarially sound, it is clearly not so because it requires the company to establish reserves in addition to unearned premiums to cover the company's long-term obligation to renew during the policies' first 2 years. It may be actuarially sound for reasons (e.g., high early cancellation rate) which are completely irrelevant for purposes of determining the Federal tax classification of the policies with respect to which it is employed. The salient point here is that, under the method, no reserve in addition to unearned premiums is required to be established to cover petitioner's obligation to renew its policies 2 years or less in force and there can, in my opinion, simply be no argument based upon the relative actuarial soundness of the preliminary term method vis-a-vis the net level method.

## B. Petitioner's "Aggregate" Theory of Reserving

Petitioner argues that even though its policies in force 2 years or less did not contribute computationally to its midterminal reserves under the 2-year preliminary term method, it nonetheless should be considered to have maintained a reserve in addition to unearned premiums to cover its obligation to renew with respect to such policies. Petitioner argues that its mid-terminal reserves, as reflected on line 1, part 3A of schedule H of its annual statement, are properly viewed only as an aggregate liability carried *with respect to* all of its renewable policies within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., whether a particular

policy contributes computationally to the reserve or not. The majority appears to have accepted this contention; I cannot.

Initially, the very language of the regulations we are interpreting in this case militates against such a conclusion. Sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., are drafted in the *singular*. They require that in order for *a* policy to be classified as noncancelable or guaranteed renewable it must be *an* accident and health contract which the insurance company is under an obligation to renew and *with respect to which* a reserve in addition to unearned premiums must be carried to cover *that obligation to renew*.

As noted above, the obligation to renew a particular policy can be represented by an actuarially quantifiable dollar amount. This amount constitutes the amount by which the present value of future benefits to be paid under the policy exceeds the present value of future net valuation premiums *on that policy*. Despite the fact that each of petitioner's policies 2 years or less in force may produce a positive dollar amount *if* it was subjected to the above calculation, under the preliminary term method of reserving no amount will be contributed to a mid-terminal reserve *with respect to that policy*. Moreover, the amounts which actually contributed to a mid-terminal reserve *with respect to* other policies which have passed their third year of existence are only those amounts *assumed sufficient* to cover the actuarial risks attributable *to those policies* (see note 14 *supra*). No amounts are contributed to cover risks incurred on policies 2 years or less in force.

It can be conceded that the total dollar amount of a reserve is, in a sense, an aggregate amount, and that the term "reserve" has only limited significance when not viewed in the aggregate. To use respondent's example, the insured under a $1,000 face amount life insurance policy either will or will not die during the current policy year and the company's liability under the policy either will or will not mature. Thus, while the actuarial probability of death could be computed at the beginning of the policy year at, say, .00426, it would be meaningless to speak of a reserve of $4.26 to provide for the risk that the issuing company would have to pay a $1,000 death claim. The reserve simply means that the probability is that out of 1 million persons similarly situated, about 4,260 can be predicted to die within the period. Thus, the reserve is

simply computed by multiplying .00426 by the number of $1,000 life exposures *falling within the class*, and the aggregate amount thus computed makes up the reserve.

However, the fundamental fact here is that the total dollar value of a reserve does not arise in a vacuum. This dollar figure is a result of the summation of actuarially computed dollar amounts derived from premiums paid on each individual policy which, under the valuation method selected by the insurer, are to contribute to the reserve. The aggregate amount thus computed represents the actuarial estimate of the amount *assumed sufficient* to meet claims which arise under those policies which contribute computationally to the reserve. I do not think that these reserves can legitimately be considered to be maintained "with respect to" such noncontributing policies within the meaning of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., by invoking a convoluted "aggregate theory" of reserves. Indeed, the Supreme Court has, in an analogous context, specifically rejected the proposition that "reserves follow the risks." See *United States v. Consumer Life Insurance Co.*, 430 U.S. 725 (1977).

Petitioner's experts in this case have made much of the fact that all of the assets retained in petitioner's mid-terminal reserves are potentially available to meet the claims of insureds holding any renewable policy. However, this fact should not lead to the conclusion that such reserves are carried "with respect to" petitioner's renewable policies 2 years or less in force within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. As petitioner's expert conceded, the assets maintained in petitioner's mid-terminal reserve with respect to a particular class of policies, *as well as other company assets*, may become subject to the claims of *any* policyholder, whether the particular policy under which the insured asserts his claim contributed to the specific reserve or not. For example, if a company, issuing both a class of cancelable policies with respect to which no mid-terminal reserves are maintained, and a class of policies with respect to which it has accumulated mid-terminal reserves, finds that its unearned premiums and unpaid loss reserves are insufficient to satisfy claims arising under its cancelable policies during a particular year, it would nonetheless be required to satisfy claims arising under such policies out of its accumulated mid-

terminal reserves (assuming unallocated surplus was insufficient to satisfy such claims). The same would be true with respect to petitioner's renewable policies in force less than 2 years. That is, if the gross unearned premium reserve maintained with respect to such policies proved inadequate to satisfy claims arising under such policies in a given year, petitioner would nevertheless be required to satisfy those claims out of its accumulated mid-terminal reserves even though such policies had never contributed any portion of their premiums to such reserve. In this sense, the company's *liability* on all of its contracts of insurance is an aggregate liability. This fact should not be distorted to lead us to conclude that the additional reserve requirements of sections 1.801–3(c) and 1.801-3(d), Income Tax Regs., were satisfied by policies that in no way contribute to a long-term reserve.

### III. Did Petitioner's Unearned Premium Reserves Contain Reserves in Addition to Unearned Premiums?

The majority found it unnecesary to address petitioner's argument that its unearned premium reserves on policies 2 years or less in force somehow contained a "reserve in addition to unearned premiums." Since I feel that the theories that the majority relies upon do not support its ultimate conclusion, I find it necessary to consider this argument.

Specifically, petitioner maintains that the term "unearned premiums" as defined in section 1.801–3(e), Income Tax Regs., was intended to refer to *net* rather than gross unearned premiums, and since petitioner maintained gross unearned premium reserves with respect to all of its renewable policies, including those in force 2 years or less, it in fact maintained reserves in *addition* to "unearned premiums" as that term is defined by the regulations. Additionally, petitioner points out that the premium charged for its renewable accident and health policies included an element which was intended to cover petitioner's obligation to renew the policy at a level premium. To the extent that this additional premium charge was included in the unearned premium reserve maintained with respect to each of its renewable policies, petitioner contends that reserves in addition to unearned premiums were required or carried to cover its obligation to renew such

policies, as required by sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

Sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., require that, in order to be classified as a noncancelable or guaranteed renewable policy for Federal tax purposes, a reserve in addition to unearned premiums must be carried to cover the issuer's *obligation to renew or continue the policy at a specified premium*. In its report accompanying the 1942 Act, the Senate Finance Committee clearly articulated the types of reserves which it contemplated to fall within the definition of "reserves in addition to unearned premiums." Such reserves included:

those amounts must be reserved * * * to provide for the additional cost of carrying [noncancelable] policies *in later years* when the insured will be older and subject to greater risk *and when the cost of carrying the risk will be greater than the premiums then being received.* [Emphasis supplied.][15]

The reserve contemplated is thus a long-term reserve. However, the unearned premium reserve, whether maintained on a gross or net basis, and whether maintained with respect to cancelable or renewable policies, is inherently incapable of serving this long-term function. Such reserve merely represents the pro rata portion of the current gross or net premium which remains unearned on the annual statement date, and is intended to cover the cost of claims (if the net unearned premium is used), or the cost of claims and non-insurance expenses (if the gross unearned premium is used), which arise during the unexpired portion of the *current* premium-paying period. The unearned premium reserve, again whether maintained on a gross or net basis, diminishes ratably over the premium-paying period, so that at the end of such period, no amount of the current premium can ever remain in the reserve to cover future risks under the policy.[16] Thus, no portion of the gross or net unearned premium reserve can even arguably serve the function of a "reserve in addition to unearned premiums" as that term was intended in sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Cf. *Economy*

---

[15]S. Rept. 1631, *supra*, 1942–2 C.B. at 612.

[16]And this will be true even if under the actual experience of the company, the entire unearned premium reserve is not expended for current claim costs and expenses. Such excess amounts do not become part of a terminal or mid-terminal reserve, but rather become company surplus. See J. MacLean, *supra* at 134–140.

*Finance Corp. v. United States, supra* at 481; *Group Life & Health Insurance Co. v. United States, supra.*

Moreover, an acceptance of petitioner's interpretation of section 1.801–3(e), Income Tax Regs., would necessarily lead to the conclusion that any company which maintains unearned premium reserves on the gross, rather than the net basis, carries a reserve "in addition" to unearned premiums within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. This conclusion would necessarily follow even though such reserves are maintained with respect to cancelable policies, and would require us to equate the "additional reserves" required by sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., with the loading element contained in the gross unearned premium reserve. Such a conclusion would be demonstratably fallacious.

No obligation to renew accompanies a cancelable policy, and it is therefore axiomatic that the issuer of such policies will never be required to maintain a reserve in addition to unearned premiums within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. This application of petitioner's proposed interpretation of section 1.801–3(e), Income Tax Regs., shows quite clearly that the Treasury could not have intended to limit the definition of unearned premium reserves to "net" unearned premiums.

Furthermore, petitioner's interpretation cannot withstand scrutiny even when applied to renewable policies. The loading element contained in a gross unearned premium represents that portion of the gross premium designed to cover non-insurance costs, such as commissions and administrative expenses, and also includes a margin for profit. Such amounts clearly are not carried to cover the insurer's obligation to renew or continue the policy at a specified premium, and therefore are not capable of being classified as "reserves in addition to unearned premiums" under sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Petitioner's proposed interpretation of section 1.801–3(e), Income Tax Regs., would, however, lead directly to such a result.

The fact that petitioner charged a greater premium rate in the case of renewable policies than it would have charged for policies with the same terms but without the renewable feature is, in my opinion, completely without significance for

purposes of the present case. Although it is clear that the premium charged with respect to petitioner's renewable policy included an amount which was intended to cover petitioner's obligation to renew at a level premium, under the 2-year preliminary method, petitioner was entitled to assume, *for purposes of reserving*, that the entire premiums paid with respect to its renewable policies during each of their first 2 years of existence would be used to pay expenses and insurance claims occurring during each of the first 2 policy years. As such, no amounts of those premiums remained available at the end of the first 2 policy years with which petitioner could establish mid-terminal reserves.

The entire concept of an insurance company's taxable status is based upon the qualitative nature of the reserves the company is required to maintain. *Group Life & Health Insurance Co. v. United States, supra* at 117; *Alinco Life Insurance Co. v. United States*, 178 Ct. Cl. at 833–834, 373 F.2d at 347; *Commissioner v. Swift & Co. Employees Benefit Association*, 151 F.2d 625 (7th Cir. 1945). Premiums charged with respect to particular types of policies are irrelevant for these purposes. The salient point here is that the unearned premium reserve, whether maintained on the gross or net basis, and whether maintained with respect to cancelable or noncancelable policies, is simply not, in my opinion, the qualitative type of reserve that the Treasury intended to include within its definition of a "reserve in addition to unearned premiums" under sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

Finally, notwithstanding petitioner's contention to the contrary, I think that the specific language of section 1.801–3(e), Income Tax Regs., militates against petitioner's effort to limit the definition of the unearned premium reserve to net unearned premiums. Section 1.801–3(e), Income Tax Regs., defines "unearned premiums" as "those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance." These amounts are defined to include "all unearned premiums, whether or not required by law." It is clear that the draftsman of the regulation considered the unearned premium to represent the pro rata portion of the total premium allocable to the unexpired portion of the policy term when that term was

defined to encompass *all* unearned premiums, even though the gross unearned premium may contain an element of loading. As stated by the Court of Appeals in *Superior Life Insurance Co. v. United States*, 462 F.2d 945, 951 (4th Cir. 1972):

> The universally accepted meaning of "premium" is the amount paid by the insured for coverage. It does not refer to any particular portion of the sum paid by the insured. * * * Our interpretation is not inconsistent with * * * [sec. 1.801–3(e), Income Tax Regs.]; both the morbidity portion and the loading portion are, we think, "costs" of insuring. * * * Until a prorated portion of the premium is earned, no loading costs are considered due against it. In this sense, the *total* unearned premium is a "reserve" for future obligations. [Emphasis in original; fn. ref. omitted.]

See also *Union Mutual Life Insurance Co. v. United States*, 570 F.2d 382 (1st Cir. 1978), cert. denied 439 U.S. 821 (1978); *Group Life & Health Insurance Co. v. United States, supra.*

I would therefore reject petitioner's contention that the gross pro rata unearned premium reserve which was maintained with respect to its renewable policies contained a reserve in addition to unearned premiums as required by sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

## IV. Other Points

The majority feels that certain other provisions of subchapter L and the regulations thereunder support its ultimate conclusion on the main issue in this case. For the reasons stated hereafter, I do not agree.

### A. SECTION 818(c)

Life insurance companies, like all insurance companies, are permitted to deduct annual additions to reserves for purposes of computing taxable income. *If* a company qualifies as a life insurance company, and values mid-terminal reserves on a preliminary term method, it *may* elect to compute the deduction for annual additions to reserves on the net-level basis, even though it, in reality, uses a preliminary term method. Sec. 818(c).

The election under section 818(c) may, from a tax perspective, prove beneficial to a life insurance company in one year, and prove disadvantageous to such company in a later year. However, once the election is made, it cannot be withdrawn by the company without permission of the Commissioner.

The majority asserts that our interpretation of the regulations would "undermine section 818(c)."

This argument, in my opinion, places the cart before the horse. Only "life insurance companies" are entitled to the specific relief contained in section 818(c). Section 818(c) has nothing to do with the definition of such a company. Indeed, the legislative history of section 818(c), cited by the majority, speaks of "life insurance companies" throughout, and refers to the equalization of reserve deduction treatment among "life insurance companies."

If it is determined that the company does not meet the "life insurance company" test of section 801, such company was simply not intended to benefit from the provisions of 818(c). Thus, only if one presupposes that the companies we have before us are the types of companies Congress intended to treat as "life insurance companies," can one conclude that my interpretation of the regulations "undermines section 818(c)." In fact, Congress, in my opinion, did not intend such companies to be treated as "life insurance companies." Congress, in section 818(c), simply noted one possible adverse tax consequence of the use by a "life insurance company" of the preliminary term method, and chose to provide relief, and has not seen fit to legislate with respect to the effect of the preliminary term method on an insurance company's tax status. We clearly may not do so here.

## B. Section 1.801–3(b)(2), Income Tax Regs.

Section 1.801–3(b)(2), Income Tax Regs., provides:

An insurance company writing only noncancellable life, health, or accident policies *and having no "life insurance reserves"* may qualify as a life insurance company if its unearned premiums, and unpaid losses (whether or not ascertained), on such policies comprise more than 50 percent of its total reserves. [Emphasis supplied.]

The majority believes that my interpretation of sections 1.801–3(c) and 1.801–3(d) of the regulations (i.e., that a company must carry a "reserve in addition to unearned premiums" with respect to every policy that it seeks to classify as noncancelable or guaranteed renewable), is *incompatible* with the above regulation. The majority states that the situation contemplated in section 1.801–3(b)(2), Income Tax Regs. (i.e., that a company could qualify as a "life insurance

company" even though it has no "life insurance reserves"), could never arise under our interpretation of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., since the company would have to have "life insurance reserves" in order for its policies to qualify as "noncancellable" or "guaranteed renewable" in the first place. I disagree.

"Life insurance reserve" is a term of art, specifically defined in section 801(b). See also sec. 1.801–4(a), Income Tax Regs. Briefly stated, in order to qualify as a "life insurance reserve," such reserve must generally meet a five-part test.

(1) It must be computed or estimated on the basis of recognized mortality or morbidity tables;

(2) It must have assumed rates of interest;

(3) It must be set aside to mature or liquidate future unaccrued claims;

(4) It must involve life, health, or accident contingencies; and

(5) It must be required by law.

Whether a particular reserve established by a company qualifies as a technical "life insurance reserve" has been a much-litigated issue. See, e.g., *Helvering v. Inter-Mountain Life Insurance Co.*, 294 U.S. 686 (1935); *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920); *Group Life & Health Insurance Co. v. United States*, 660 F.2d 1042 (5th Cir. 1981); *Mutual Benefit Life Insurance Co. v. Commissioner*, 488 F.2d 1101 (3d Cir. 1973), affg. 58 T.C. 679 (1972), cert. denied 419 U.S. 882 (1974); *Lamana-Panno-Fallo Industrial Insurance Co. v. Commissioner*, 127 F.2d 56 (5th Cir. 1942); *Delta Life Insurance Co. v. United States*, 363 F. Supp. 410 (E.D. La. 1973); *Central National Life Insurance Co. of Omaha v. United States*, 216 Ct. Cl. 260, 574 F.2d 1067 (1978).

However, in order to be classified as a "noncancellable" or "guaranteed renewable" accident or health policy, sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., *do not* require that policy to first run the guantlet of section 801(b). That is, under these regulations, whether the company maintains technical "life insurance reserves" with respect to such policies is irrelevant in their Federal tax classification. All sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., require is that the health or accident policy be a "long-term" policy *"with respect to which a reserve in addition to unearned premiums must be carried"* to cover the company's long-term

obligation under the policy. The regulations do not require that the policy be one with respect to which a technical "life insurance reserve" be carried. The Treasury, when drafting these regulations, did not deem it necessary to inquire whether a "reserve in addition to unearned premiums" met the technical "life insurance reserves" test of section 801(b) when the reserves were being examined solely for purposes of determining whether policies should be classified as noncancelable or guaranteed renewable. For these purposes, it is sufficient that the reserves be carried to cover a company's long-term obligation under the policy to renew at a level premium, a test somewhat *less* stringent than that provided for technical "life insurance reserves."

Of course, if the "reserve in addition to unearned premiums" does not meet the technical "life insurance reserve" definition of section 801(b) and section 1.801–4(a), Income Tax Regs., it will not be placed in the numerator of the section 801 qualification ratio since under section 801 only "life insurance reserves" and unearned premiums and unpaid losses on noncancelable or guaranteed renewable life, health, or accident policies are so included by the specific terms of the statute. Nevertheless, this regulation recognizes that a company issuing "guaranteed renewable" or "noncancellable accident" and health policies will qualify as a "life insurance company" if the more-than-50-percent test of section 801(a) is met, even if the "reserve in addition to unearned premiums" which the company is required to carry for definitional purposes under sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., does not meet all of the technical requirements of a "life insurance reserve" contained in section 801(b). See Rev. Rul. 67–224, 1967–2 C.B. 231. Moreover, under such circumstances the 50-percent test will only be satisfied if unearned premiums and unpaid losses on such policies comprise (exclusive of "additional reserves") more than 50 percent of the company's total reserves.

## V. Did Respondent "Abuse His Discretion"?

Petitioner, in this case, seems to argue that it would be an "abuse of discretion" under section 7805(b) for respondent to apply to petitioner his current interpretation of the Federal tax definition of "noncancellable or guaranteed renewable." It

is clear, however, that petitioner was not the recipient of a written ruling wherein respondent had taken another position. Thus, a host of cases, beginning with the Supreme Court's decision in *Auto Club of Michigan v. Commissioner,* 353 U.S. 180 (1957), renders petitioner's position without merit. See also *Bookwalter v. Brecklein,* 357 F.2d 78 (8th Cir. 1966); *Monarch v. Commissioner,* 139 F.2d 863 (8th Cir. 1944); *Richardson v. Commissioner,* 64 T.C. 621 (1975); *Rose v. Commissioner,* 55 T.C. 28 (1970).

---

For the above reasons, I would hold that, for Federal tax purposes, petitioner failed to meet the statutory test of a "life insurance company" for the period before us, it being conceded that it fails to meet the over-50-percent test of section 801(a), unless its unearned premiums and unpaid losses attributable to its long-term health and accident policies, during their first 2 years of existence, are added to the numerator of the statutory fraction. Since the majority holds to the contrary, I dissent.

FAY, STERRETT, CHABOT, and PARKER, *JJ.,* agree with this dissenting opinion.